COMMONWEALTH *vs.* NICOLA SACCO & another.

Norfolk. January 11, 12, 13, 1926. — May 12, 1926.

Present: RUGG, C.J., BRALEY, CARROLL, WAIT, & SANDERSON, JJ.

*Homicide. Practice, Criminal,* Insane defendant, New trial, Waiver of demurrer by going to trial on merits, Exceptions, Closing argument by district attorney, Jury, Order of evidence, Cross-examination of witness. *Pleading, Criminal,* Bill of particulars, Indictment. *Insane Person. Jury and Jurors. Evidence,* Relevancy and materiality, Record of conviction, Competency, Absence of witness. *Witness,* Cross-examination; Impeachment; Absent witness; Opinion: expert. *Words,* "Bystanders."

A defendant who had been convicted of murder was sane at the time of the ·trial and at the time of allowance of a bill of exceptions more than three years after his conviction. Three months after the allowance of the bill of exceptions, the State expert for insane criminals and the physician of the State prison sent to a judge of the Superior Court a statement

that such defendant had been examined and was believed to be insane and a dangerous person, and it was recommended that he be transferred to the Bridgewater State Hospital. The judge found the defendant to be insane and issued a warrant to the warden of the State prison directing his removal to the Bridgewater State Hospital. About four months later, the commissioner of correction and the superintendent of the State hospital indorsed upon the warrant a statement that the defendant ought to be returned to the State prison, which was accompanied by a written statement by the medical director of the hospital that he believed the defendant to be "normal mentally," and he thereupon was returned. There was no other adjudication as to the sanity of the defendant. *Held*, that

(1) The order of the commissioner of correction and of the superintendent of the Bridgewater State Hospital was in accordance with G. L. c. 123, § 103;

(2) The warrant of the court determined only that the defendant was insane when the warrant was issued; and the order for his return showed that he had recovered;

(3) After the return of the defendant to the State prison on the order of the commissioner of correction, the presumption of sanity controlled and it must be assumed that, no further inquiry having been applied for, he was mentally competent to retain and instruct counsel to protect his legal rights then pending before the court.

St. 1922, c. 508, substituting a new section for G. L. c. 278, § 29, providing among other things that in capital cases a motion for a new trial may be granted at any time before sentence, is remedial in character and applies to a motion for a new trial of an indictment where the defendant had been found guilty in July, 1921, and had not yet been sentenced at the time of the filing of the motion more than one year later.

Each of two defendants in September, 1920, pleaded not guilty to an indictment for murder. A special sitting of the court was called to try the indictment in May, 1921, at which time one defendant filed a motion for a separate trial and each defendant moved for a bill of particulars and demurred to the indictment. No order permitting the withdrawal of the pleas was entered. The matter of the motions and demurrers was taken up by the trial judge in chambers. No decision on the demurrers was entered and the trial went forward without such a decision being entered. No exception to the empanelling of the jury on the ground that there had been no decision on the demurrers was saved. The defendants were found guilty. *Held*, that no error requiring a remanding of the case for decision upon the demurrers was shown.

An indictment, charging two defendants with an assault and beating with intent to murder by shooting with a loaded pistol and the shooting and murder of the victim, set out the time and place of the assault and beating, the residence of each defendant, the intent of the defendants to murder by shooting with a loaded pistol, and the carrying out of the intent. The defendants filed a demand for a bill of particulars which should state whether the defendants acted jointly or individually; if they acted jointly, a statement of "exactly how and in what manner" they acted and "did jointly assault with a loaded pistol"; if one com-

mitted the assault and did the shooting and the other aided and abetted, which committed the assault and which aided and abetted; whether it was intended to prove conspiracy of either with the other; and whether the killing was by shooting or by beating with a loaded pistol. The motion was heard in chambers. After the jury was empanelled, the sheriff by consent of the district attorney and counsel for the defendants was made by the court the custodian of certain weapons and bullets subject to examination by an expert for the defendants; and the judge stated as to the rest of the motion for a bill of particulars that it "remains open." The record recited that counsel for the defendant stated, "The defendant asks an exception in so far as the other matters referred to in the bill of particulars." No further order or ruling was made on the demand for a bill of particulars nor was the attention of the judge again called to the question, and the trial proceeded. The defendants were found guilty. *Held*, that

    (1) The indictments were good at common law;

    (2) The indictments were sufficient under the statute;

    (3) If it be assumed that an exception was saved to a failure by the judge to allow the motion for the bill of particulars, no error was disclosed.

The mere facts, that one of two defendants jointly indicted for murder had been indicted and convicted of assaulting and beating with intent to murder still another victim, and that at the trial of the pending indictment the Commonwealth intended to show that the same instrumentalities were used as were used on the occasion of the other assault, did not as a matter of law require the granting of a motion for a severance and a separate trial of the two defendants, the disposition of such motion being within the discretion of the court.

At the trial of an indictment of two defendants for murder, there was evidence that immediately following the crime the defendants and others made their escape in an automobile, went over a railroad crossing, and then passed through several towns in the general neighborhood of the crime, and that during the journey both defendants were seen by persons who afterwards identified them at the trial, one of the defendants being described as having been in the second seat of the automobile and leaning forward or out at certain times during its progress. The gate tender at the railroad crossing first crossed testified that that defendant was driving the car. In his closing argument, the district attorney said in part, "They say that . . . [the gate tender] is wrong in saying that . . . [such defendant] was driving that car. I agree with them . . . You must be overwhelmed with the testimony that when the car started it was driven by a light haired man who showed every indication of being sickly . . . but he [the gate tender] saw the face of . . . [the defendant in question] in that car, and is testimony to be rejected if it disagrees with everybody else if you are satisfied he honestly meant to tell the truth? . . . I ask you to find as a matter of common sense he [the defendant in question] was, in the light of other witnesses, in the car, and if on the left side that he may well have been immediately behind the driver." The defendants contended that the district attorney's admissions bound the Commonwealth and that therefore it was improper for the jury to consider the gate tender's testimony,

and that without it that defendant could not be found guilty. *Held,* that

(1) It did not follow from the admissions by the district attorney that it was improper for the jury to consider the gate tender's testimony;

(2) There was evidence warranting the conviction.

The word "bystanders" as used in G. L. c. 234, § 27, means qualified talesmen summoned by the sheriff from the county at large.

At the trial of an indictment against two defendants for murder, a panel of five hundred jurors was exhausted after seven jurors had been chosen. The trial judge, purporting to act under G. L. c. 234, § 27, directed the sheriff to return two hundred talesmen to complete the panel. The following morning the sheriff returned one hundred and seventy-five men chosen from the county at large. The judge found that no partiality was shown in the selection of such talesmen. Detailed questions were asked by the judge of each talesman seeking to disclose any bias or disqualifying elements in his character or state of mind. The judge refused to allow the defendants' counsel to examine each talesman summoned preliminary to exercising his right of peremptory challenge and refused to put to each talesman called the following questions: "Is the juror an employer of labor? If the juror is an employer of labor, does he employ union help when union help is available? If the juror is an employee, is he a member of any union? Is the juror opposed to organized labor?" It appeared that the evidence to be introduced would show that the defendants were radical socialists and were opposed to what they termed the capitalist as distinguished from the laborer. *Held,* that

(1) No fraud nor partiality in favor of the Commonwealth or material injury to the defendants was shown;

(2) The proceedings under the statute were proper.

At the trial of the indictment above described, there was evidence that the murder was committed on April 15, 1920, that the murderers made their escape in an automobile which afterwards was found abandoned in an adjacent county and at the trial was identified by several persons, some of whom testified that they had seen the defendants in or near the same automobile before the murder and others of whom testified that they saw them in the automobile during its flight; that on a night twenty days after the murder the defendants were in a town near the place where the automobile had been found and acted in a suspicious manner when the wife of a person whom one of them interviewed went to a neighboring house to telephone; that they were arrested on the same night and made motions as though to draw weapons upon the arresting officer; that they denied being armed; that afterwards upon search it was disclosed that both of them were armed and that one of them had upon him a revolver from which, testimony showed, the mortal bullet might have been fired, while the other had upon him a revolver which had been in the possession of the murdered man a comparatively short time before the crime. *Held,* that

(1) Evidence tending to identify the automobile as one previously stolen was admissible, the judge charging the jury that the theft of the car of itself "has nothing to do with this case whatever";

(2) Evidence tending to show suspicious actions on the part of the defendants on a night twenty days after the crime was admissible to prove consciousness of guilt; and exceptions to separate portions of such testimony were overruled since such evidence could not be introduced as a whole but only step by step, and the order of its introduction was within the discretion of the trial judge;

(3) Testimony of a witness that he saw one of the defendants fourteen days before the crime in an automobile of the description of the bandit car was admissible;

(4) Certain evidence of a conversation of a companion of the defendants on the night twenty days after the murder was admissible in connection with evidence tending to show that the defendants, either or both of them, heard the conversation.

It was proper, after a witness for the Commonwealth had testified that a few nights before the murder he had seen a revolver of .38-calibre and nickel plated, the make of which he did not know, in the possession of the murdered person, to permit him further to be asked, "To the best of your knowledge, belief or recollection, is the revolver that I now show you like in appearance to the one you saw in" the possession of the murdered person, where there was evidence afterwards introduced that the revolver shown to the witness was found on the person of one of the defendants at the time of his arrest and that it was a .38-calibre revolver and nickel plated.

At the trial above described, a witness for the Commonwealth had testified that he "wouldn't say" that a person whom he saw shooting the murdered man was one of the defendants in the dock, but "he is the dead image of him," that "he has got the same appearance." The witness then was asked by the district attorney, "Have you got any question in your own mind but what he is the man?" Subject to exception by the defendant, he answered, "I wouldn't say he is the man, but he is the dead image of the man I seen." *Held,* that, the question being one of identification, the exception must be overruled even though the question was leading.

At the trial of the indictment above described, a witness for the Commonwealth, a woman, who had identified one of the defendants as a man whom she saw in the neighborhood of the place of the murder over three hours before the murder, testified that a woman who was with her at that time had cataracts on the backs of both eyes and had had them for a long time. Counsel for the defendant thus identified declined to disclaim any purpose to argue that, if the witness's companion was not present as a witness for the Commonwealth, a fair inference would be that her evidence would be unfavorable to its contention, and the judge admitted the evidence as to the cataracts. Afterwards the companion was called by the defendant and gave a version of what she saw that contradicted the witness for the Commonwealth. *Held,* that

(1) In the circumstances, the evidence as to the cataracts was harmless and the defendant's exception must be overruled;

(2) It was proper, after a cross-examination of the Commonwealth's witness above described concerning a cabinet of pictures that had been

shown to her at her home by counsel for the defence, to permit her to state, "When I heard of the shooting I somehow associated the man I saw at the car," and also to describe her mental state or condition when she answered inquiries by the counsel when he showed her the pictures, as well as the cause of that condition;'

(3) It was proper to ask the witness, referring to testimony by her that an Italian had called at her house, "Did she [you] talk with this Italian two or three days before concerning the alleged shooting?" and her answer, "I did talk with the Italian concerning this shooting," was relevant and admissible in the circumstances;

(4) In cross-examination of the witness after her testimony regarding several photographs, it was not beyond the discretionary power of the trial judge to exclude a question, "And prior to it you had said that the one marked 'X' was not the one?" after she had answered affirmatively, "And that, you say, . . . [referring to a photograph marked 'XX'] represented the first one that . . . [associate counsel for the defendant] spoke to you about . . . ?"

At the trial of the indictment above described, a gateman at a railroad crossing, who testified for the Commonwealth, stated in direct examination that the bandit car came by him and he saw the driver whom he identified as one of the defendants. On cross-examination he stated that he could not remember telling that defendant's attorney in substance that the curtain of the car prevented his seeing the man driving the car. On redirect examination he stated that he could not remember whether any one had talked with him about the case. *Held*, that it was within the discretion of the trial judge to refuse to permit counsel for the defendant further to ask the witness in recross-examination, "So that you stand, in the light of all your senses, today your position is that I never spoke to you there at the gate house, whether it is two, three, or four weeks ago?"

At the trial above described, a witness for the Commonwealth testified in substance to being on a train on the morning of the day of the murder and engaging in a conversation which included a passenger whom he identified as one of the defendants, and that that passenger left the train at East Braintree. The murder was near the South Braintree station. He was subjected to a long, searching cross-examination in which he expressed doubt as to whether the man who made the inquiries on the train was the defendant he had identified in his direct examination. The judge of his own motion asked the witness, "What effect, if any, did the South Braintree shooting have upon your mind?" and the following answers and questions resulted, all of which were admitted subject to exceptions by the defendant: "Well, it had that much on my mind that I thought that was one of the crowd that came up in the train with me." — "Q. When did you have that thought? A. Why, as soon as I read the paper. — Q. That was when? A. Why, I think, the next day." *Held*, that the questions and answers were admissible on the question of the credibility of the testimony of the witness as tending to exhaust his memory in view of his conflicting statements.

At the trial above described, a witness for the Commonwealth had testified that he saw the bandit car just before 9:30 in the morning of the murder

at a point nearby the scene of the murder, which was adjacent to South Braintree railroad station. The murder was at about three o'clock in the afternoon. Another witness testified that one of the defendants left the train at East Braintree station at about the same time when the first witness had seen the bandit car. A third witness testified that some time between ten and twelve o'clock on the same morning he saw the car with a number of men driving through South Braintree public square toward Brockton and that one of the persons in the car was the defendant whom the second witness had identified. The Commonwealth contended that the car, after having been seen by the first witness, had gone to East Braintree station, had taken the identified defendant aboard, and then had returned to South Braintree, when it and the defendant were seen by the third witness. The third witness, having testified in cross-examination that he saw the car in South Braintree nearer ten than twelve o'clock, was further asked, "Well, doesn't that bring to your mind this was something before ten o'clock?" The question was excluded, the trial judge stating, "You assume in your question that on which there is no testimony. On that ground I will exclude it, and allow you to put it in proper form, by asking, 'Does that bring to your mind anything that happened?'" The defendant insisted upon the question as asked and saved an exception to its exclusion. *Held*, that

(1) The judge did not rule that leading questions could not be asked on cross-examination, or indicate to counsel that they were to be deprived of the advantage of cross-examination;

(2) The exclusion was within the discretionary power of the trial judge.

A witness, who had testified to seeing the bandit automobile immediately after the murder and that one of the defendants whom he identified was in the car and leaned out and "poked a gun" at him, was asked on cross-examination, "Are you not a defendant in a criminal case in this court?" and answered in the negative. The question and answer were excluded subject to the defendant's exception. Later, the defendant's counsel stated to the trial judge that he had in his possession the files from the clerk's office showing that that witness had been charged with larceny, had pleaded guilty, and that the case had been filed and the witness given probation, and the question was renewed. The judge adhered to the former ruling on the ground that such examination would be inadmissible because the case had been filed. *Held*, that the ruling was right, there having been no conviction and sentence of the witness and no evidence that he had been promised that if he would testify for the Commonwealth in the case at bar the case against him for larceny would be filed and that he would be placed on probation.

One of the police officers who had arrested the defendants in the indictments above described and had testified to circumstances in connection with their arrest and search, was shown on cross-examination to have been watching the prisoners at the police station whenever persons came there to identify them, and was asked, "Were you there when any one came in there and said anything indicating that they did not recognize these men?" The question was excluded subject to excep-

tion by the defendants. There was nothing to show that the Commonwealth was suppressing evidence. *Held*, that

(1) Identification or failure to identify could not be proved by testimony of others than those who had attempted identification;

(2) The question was not admissible to show that the Commonwealth had not produced certain eyewitnesses who were prepared to testify that the defendants were not the men involved in the crime.

A witness for the Commonwealth testified without objection or exception that after the murder and on the same afternoon she saw the bandit automobile running at high speed in a county adjoining that of the murder and took its number and that three days later she talked with a police lieutenant, remembered the number, and gave it to him, and that at the trial she remembered some of the digits of that number. The lieutenant, testifying for the Commonwealth, was permitted, subject to the defendant's exception, to testify that the previous witness gave him a number and that at the time the number was given the subject of the conversation was the automobile which she had previously seen. He, however, did not testify as to the number and the judge stated, "The purpose was to get in some number plates, or the numbers. They are not in, gentlemen, and you will give them no consideration whatsoever." *Held*, that the exception must be overruled since the defendants had no ground of complaint because of the admission of the evidence of the police lieutenant.

When the defendants in the indictment above described were arrested, one of them was found to have on his person a revolver which was introduced in evidence. An employee who "had charge of pistols and repairs to firearms" in a sporting goods establishment testified that the murdered man twenty-six days before the murder had brought in for repairs a revolver which he had sent up to the shop. The witness, being shown the revolver in evidence, was asked, "Can you tell the jury whether or not the revolver which was brought in on that date is of the same type and calibre of revolver as the one I have now shown you?" and answered affirmatively. He then was asked, "Will you tell us whether or not that revolver which I have shown to you answers the description of the revolver brought in that day?" and answered, "It does," subject to exception by the defendants. *Held*, that the question and answer were admissible and the exception must be overruled.

Following the testimony of the witness above described, one who was in the same employ and was "foreman of the gun shop" testified, refreshing his memory from records as to the repair of the revolver left by the murdered man. In refreshing his recollection it was disclosed that, whereas the previous witness had testified to a .38-calibre revolver being left, the records of this witness were that a .32-calibre revolver was left, and he was asked by the district attorney, "What, if any, distinctions are there between a 32 and 38 . . . revolvers" of the make in question, and answered in substance that "a 38 and 32 are the same size frame in" that make and type revolver. *Held*, that the defendants' exception must be overruled.

A salesman who was a fellow employee of the two preceding witnesses stated that his concern had had an established custom "regarding the

disposition of revolvers or guns which are not delivered or called for after repairs are made upon them," and stated the custom to be in substance that at stocktaking time the first of the year revolvers were taken from the repair drawer, put in the desk in the office, and were held there for a while and then sold; that the revolver which had been left by the murdered man had not been sold from that store; that there had been but one sale between the time that the revolver had been left and the time of the murder. The witness, subject to exception by the defendant, was asked, "And was this revolver sold at that time?" and answered, "That revolver was not sold at that time." In his testimony, there were conflicting statements. *Held,* that

(1) The testimony was admissible, the weight of it being for the jury, it being relevant to the issue, whether the revolver found on the defendant was the revolver of the murdered man;

(2) The established course of the business of the witnesses' employer was admissible.

A cap was found near the murdered man immediately after the murder. A witness for the Commonwealth, who had known and had lived near one of the defendants for ten or twelve years and had employed him in a shoe factory for six or eight months before the murder, testified that he had seen the defendant wearing a dark cap of a salt and pepper design and naturally dirty; that he could not describe it otherwise than as a dark cap. Asked if the cap in evidence was "alike in appearance to the cap" which he had seen the defendant wear, he answered, "The only thing I could say about that cap . . . it was similar in color. As far as details are concerned, I could not say it was," and further stated that the only opportunity he had of observing the cap was when it was hanging on a nail in the factory. He then was asked whether, according to his best judgment, the cap in evidence was "alike in appearance to the cap worn by" the defendant, and answered, "In color only . . . General appearance . . . I never saw that cap so close in my life as I do now . . . In its general appearance, it is the same." Subject to the defendant's exception, the cap was admitted in evidence. *Held,* that the admission was proper.

A police officer testifying for the Commonwealth stated that he had visited the home of the defendant whose cap the Commonwealth contended was found at the place of the murder and near the body of the murdered man, and had taken a cap therefrom. This cap was introduced in evidence. The defendant, in cross-examination, after having stated that this cap looked like his cap, "something like," and that he thought that it was his cap, tried the cap on at the request of the district attorney and then stated, "I don't know. That cap looks too dirty to me because I never wear dirty cap. I think I always have fifty cents to buy a cap, and I don't work with a cap on my head when I work. I always keep clean cap. Right when I go to the factory, take all my clothes off and put overalls and jump. It look to me pretty dirty and too dark. Mine I think was little more light, little more gray." In his argument to the jury, the district attorney argued that the defendant would not admit that the cap found at his house was his own. On objection by the defendant's counsel on the ground that the testimony

of the defendant was that "he wasn't sure because he thought his cap was a little lighter" and that at no time did he say positively that it was not his cap, the trial judge said, "That is my recollection of the testimony . . . But it is for you gentlemen to determine what the evidence was," and the defendant saved an exception. The district attorney, continuing his argument, urged upon the jury that the defendant in substance had said, "No, that cap is too dirty. I have got fifty cents to buy a new cap whenever I need one," and continued, "and I ask you, gentlemen, if it is not a fair inference from that statement . . . to say that . . . [the defendant] denied that was his cap." *Held,* that

(1) The argument did not exceed the reasonable rights of the Commonwealth to comment on the credibility of the defendant's testimony, which was left by the judge to the determination of the jury;

(2) The exception must be overruled.

An exception to a ruling by the trial judge at the trial above described striking out certain answers of a witness for the defendants in his direct examination was overruled where it appeared that the defendants were not prejudiced since the testimony sought to be thus introduced was in evidence from testimony of the same witness preceding and following the questions and answers excluded.

It is within the discretion of a trial judge to exclude a leading question asked by the defendant of his own witness in redirect examination.

A woman who, testifying for one of the defendants in the indictment above described, stated that he was at her home in another part of the State between 11:30 and 12 on the forenoon of the day of the murder, in order to show how she remembered the time stated that she had left a hospital the previous week and that because of her condition on the day before the murder the doctor at the hospital had been telephoned to. A nurse at the hospital was asked to produce the records of the hospital relating to the witness's case and testified that, while records were kept, no one was designated to keep them and that the record of the case in question was in her own handwriting but that she was not the nurse who visited the witness. The records were excluded. *Held,* that the records were properly excluded in the circumstances.

An exception to the exclusion of a question put to one of the defendants above described in his direct examination must be overruled where it appears that the information sought by the question afterwards was introduced in another form in further examination of the defendant without objection, so that, if there were error in the former ruling, it was cured.

It is the rule in this Commonwealth, which is applicable to a trial of an indictment for murder, that a defendant who has taken the stand may be cross-examined in the discretion of the trial judge to test his accuracy, veracity or credibility, or to shake his credit by injuring his character, and for this purpose his way of life, his associations, his habits, his prejudices, his physical defects and infirmities, his mental idiosyncrasies, if they affect his capacity, his means of knowledge, powers of discernment, memory and description, may all be relevant. Per BRALEY, J.

At the trial above described, one of the defendants in direct examination testified at length as to his personal history, and the general subject of his loyalty to the United States and respect for its system of government and institutions was inquired about and developed. It appeared in his direct examination that he was active as a radical at the time of the war and had assumed a name other than his own "in order not to get in trouble in connection with registration." Questions asked of him in cross-examination, subject to exceptions by the defendant, which tested his assertions as to his love of country and his conceptions of the institutions of this country and the effect thereon of publications of which he approved and of his views, were *held* to have been admissible within the discretion of the trial judge and not to have been objectionable; and it was *further held*, that the record did not disclose that it was the obvious purpose of the district attorney by the questions to excite and intensify prejudice against him.

When a witness has testified directly to a fact from the experience of his own senses, the extent to which he shall be allowed to testify to circumstances corroborative of the truth of what he thus has sworn must rest in the discretion of the trial judge.

One of the defendants at the trial of the indictment above described in his testimony in direct examination stated that the revolver which was found upon him at the time of his arrest, and which the Commonwealth contended and introduced evidence to show had been taken from the murdered man at the time of the murder, had been procured by that defendant from a man who had purchased it from one of those who were associated with the defendants at night a few hours previous to their arrest, when, the Commonwealth contended, their conduct showed consciousness of guilt. The defendants also testified that such conduct was explained by fear on their part and on the part of their associates of arrest and possible deportation for participation in efforts which tended to impede the Federal government in its prosecution of the World War. The associate from whom, the defendant testified, the revolver had been purchased was in the court room during part of the trial and the district attorney, subject to exception by the defendants, in his closing argument contended that he was not put on the stand by the defendants because, if he had been called, he would have given testimony which would have been against their interest. *Held*, that it was within the discretionary power of the trial judge to permit the argument to be made.

After the beginning of the trial above described, the district attorney went out of office and his successor, although at that time he had associated with him a first and a second assistant district attorney and a deputy district attorney, purported to appoint him as a "special assistant district attorney," to assist in the further prosecution of the case, and, with the consent of the court, he did so participate for some time before, under G. L. c. 12, § 2, he was appointed a special assistant attorney general by the Attorney General. *Held*, that, while the appointment by the district attorney of his predecessor as special assistant district attorney was irregular, the permitting of participation by the former district attorney in aiding the district attorney was within the power of the trial judge and the defendants were not prejudiced.

Owing to the fact that the trial judge found material and determinative facts to be otherwise than as stated in affidavits filed by the defendants, so that the propriety of his action was not before this court as a question of law, exceptions to the denial of the following motions for a new trial of the indictment above described based upon alleged newly discovered evidence were overruled:

(1) A motion based on allegations that during the deliberation of the jury the foreman used for purposes of comparison cartridges which he found in his pocket which were of the calibre of the firearm found on the person of one of the defendants, as to which the trial judge found that the production of the cartridges by the foreman and the talk or discussion about them by the jury "did not create such disturbing or prejudicial influence that might in any way affect the verdict or operate in any way whatsoever to the prejudice of the defendants, or either of them";

(2) A motion based on an allegation that previous to his being called as a juryman the foreman had stated in a conversation regarding the defendants, "Damn them, they ought to hang them anyway," as to which the trial judge made no finding excepting to deny the motion with a specific reference to the affidavit; but relating to which it appeared that each juryman before he was qualified was required to answer specific questions and that the foreman's answers thereto showed him to be unprejudiced;

(3) A motion based on affidavits by experts tending to show that the revolver found on one of the defendants could not have been the revolver which formerly belonged to the murdered man and that the revolver found on the other defendant could not have discharged the shells found near the scene of the shooting nor the mortal bullet, where it appeared that the judge declined to believe the experts for the defendant as against the experts for the Commonwealth and the jury's finding;

(4) A motion founded on affidavits, among them an affidavit by an expert on firearms who had testified for the Commonwealth, that questions asked of that expert and answered by him, "Have you an opinion as to whether bullet . . . [found in the body of the murdered man] was fired from the . . . [revolver found on one of the defendants] which is in evidence? A. I have. — Q. And what is your opinion? A. My opinion is that it is consistent with being fired from that pistol," were asked by the district attorney after a conference with him with a view to concealing the fact that, if he had been asked whether he found any evidence that the so called mortal bullet passed through the defendant's pistol, he would have answered in the negative; as to which the judge found in substance, disbelieving the affidavit of the expert and believing counter affidavits of the district attorney and of his assistant, that no such intention existed in the asking of the questions; and further found that the questions asked were fair questions, clearly expressed and easily understood, and that the expert was given full opportunity to understand and appreciate their full meaning and to answer accordingly;

(5) A motion founded on an affidavit that the whereabouts of a witness, who, if called, would have testified that neither defendant

was in the bandit car which was seen by the witness immediately after the murder, were known to the Commonwealth but that he was not summoned, and that his whereabouts were not known to the defendant so that he could not be and was not summoned; the trial judge in substance finding that the evidence offered by the affidavit was not of sufficient weight to warrant a new trial.

There was no abuse of judicial discretion in the overruling of the motions above described nor a violation of any of the constitutional rights of the defendants.

At the hearing of one of the motions above described with reference to part of the argument by the district attorney, the defendants asked the trial judge to rule that "the admissions of the district attorney as to propositions of fact alleged in support of the supplementary motions of the defendants for a new trial, are binding upon the court as well as upon the government itself, in the sense that facts thus admitted must be accepted as facts," and referred to the decision in *Commonwealth* v. *Desmond*, 5 Gray, 80. The judge denied the request "on the ground that the district attorney, for the purposes of these supplementary motions for a new trial, made no admissions of fact that I find are binding upon the Commonwealth." *Held*, that the ruling of the trial judge showed no error, the question for decision being one on all the evidence, notwithstanding any admissions that might have been made by the district attorney.

On exceptions to denials of motions for a new trial and of requests made at the hearing of those motions, only questions of law are brought to this court.

Exceptions taken to recitals by the trial judge in long statements of reasons and discussion of evidence filed in the denial of the foregoing motions were *held* not to bring before this court the propriety of such reasoning and findings since they did not relate to rulings of law and were not subject to exceptions.

The mere fact, that a trial judge in denying a motion for a new trial files a decision containing a recital of his reasons for so doing, which decision is made an appendix to a bill of exceptions to his ruling denying the motion, does not change the rule that the question of granting a new trial even in a capital case ordinarily rests in the sound discretion of the trial judge.

Two INDICTMENTS, found and returned on September 11, 1920, charging that Nicola Sacco of Stoughton and Bartolomeo Vanzetti of Plymouth on April 15, 1920, at Braintree did assault and beat Alexander Berardelli and Frederick A. Parmenter with intent to murder them by shooting them "in the body with a loaded pistol" and by such assault, beating and shooting did murder Berardelli and Parmenter. The first indictment referred to the murder of Berardelli and the second to the murder of Parmenter.

On September 28, 1920, each defendant pleaded not guilty.

The cases were continued from time to time thereafter until a special sitting of the court beginning on May 31, 1921, at which time there were present five hundred jurors. *Thayer*, J., presided.

On May 31, 1921, before the empanelling of the jury, the defendant Sacco moved for a severance and a separate trial, basing his motion on the facts, that on June 11, 1920, an indictment had been returned against his codefendant Vanzetti charging that on December 24, 1919, he had assaulted Alfred E. Cox with intent to murder him; that he had been tried and, on July 1, 1920, had been found guilty, and on August 16 had been sentenced to twelve to fifteen years in the State prison; that, in the trial of the indictment then before the court, the Commonwealth would attempt to prove that the same instrumentalities, a Buick automobile, revolvers and shot gun, were used in the commission of the two crimes and "that the same persons were interested even if they did not participate as principals" in the two crimes, "to wit, one Michael Boda, Riccardo Orciani, Bartolomeo Vanzetti, this defendant's co-defendant, and this defendant Nicola Sacco." The motion was heard on July 6, 1921, and was denied.

Before the empanelling of the jury, each defendant demanded a bill of particulars setting forth whether the defendants did jointly and together or separately and individually assault and beat with intent to murder; and, if they did so jointly, "exactly how and in what manner and what act and thing the said Sacco and the said Vanzetti, and each of them, did do to make said assault . . . setting forth how and in what manner they did jointly assault with a loaded pistol"; whether Sacco was merely present at the time of an assault made by Vanzetti but did not actually participate in the same, or whether Sacco aided and abetted in the escape of Vanzetti after such assault; similar particulars as to Vanzetti; whether it was intended to charge a conspiracy between Sacco and Vanzetti for the committing of the crime charged; whether the assault and beating resulting in the murder were actually accomplished by reason of the discharge into the body of the deceased of a bullet from a loaded pistol, or

whether the murder was accomplished by reason of the beating of the deceased with a loaded pistol, whether the loaded pistol was in the hand of Sacco or of Vanzetti; in detail the kind or character, style, calibre and name of the alleged pistol.   Action by the trial judge upon the motion is described in paragraph numbered 2 in the opinion.

Proceedings with regard to demurrers which the defendants requested leave to file on May 31, 1921, are described in paragraph numbered 1 of the opinion.

Proceedings with relation to the selection of the jury are described in paragraph numbered 4 of the opinion.   When seven jurors had been selected, the entire list of five hundred talesmen originally summoned was exhausted.   The court then adjourned for the day and the proceedings described in the opinion occurred.   The questions asked of each juror were as follows:

"1. What is your name?

"2. Where do you reside?

"3. What is your occupation?

"4. For whom do you work?

"5. How long have you lived at your present address?

"6. How long have you lived in this country?

"7. How old are you?

"8. Where were you born?

"9. Are you related to either of the defendants?

"10. Are you related to either of the deceased?

"11. Are you interested in any way in these cases?

"12. Have you formed or expressed any opinion in regard to them?

"13. Are you conscious of any bias or prejudice in that you have prejudged these cases in any way?

"14. Are your opinions of such nature that they would prevent you from returning a verdict of guilty of an offence punishable with death, provided you were satisfied that a person was guilty beyond reasonable doubt?"

Further questions, which the defendants requested that the trial judge ask the prospective jurors and which the trial judge refused to ask were as follows: "Is the juror an employer of labor?   If the juror is an employer of labor, does

he employ union help when union help is available?    If the juror is an employee, is he a member of any union?    Is the juror opposed to organized labor?"

The jury was completed and the jurors were sworn at 1:35 A.M. on June 4, 1921; and the taking of testimony began on the following Monday.

There was no dispute as to the following facts: Berardelli and Parmenter were shot in front of a factory building of Rice and Hutchins, Incorporated, on Pearl Street in South Braintree at about three o'clock in the afternoon of Thursday, April 15, 1920, by some of a group of armed men or bandits, who took from them $15,776.51 in two boxes and made their escape with their plunder in an automobile.    The determinative issue at the trial was whether the defendants Sacco and Vanzetti were two of the bandits.    Both defendants were Italians.

None of the money taken by the bandits nor either of the tin boxes was recovered, although in the "bandit car," hereinafter described, sixty-two cents in loose change was found.

The Commonwealth relied on evidence that Sacco was absent from work on the day of the murder; that the defendants were in the neighborhood of the scene of the murder on the morning when it occurred, being identified as having been there seen separately and also together; that the so called bandit car was also in the neighborhood and that Vanzetti was near and in it; that Sacco was seen near the scene of the murder before it occurred and also was seen to shoot Berardelli after he fell and that that shot caused his death; that used shells were left at the scene of the murder, some of which could have been found to have been discharged from a revolver afterwards found on Sacco; that a cap was found at the scene of the murder, which evidence tended to identify as a cap formerly worn by Sacco; that the bandit car after the murder proceeded down Pearl Street toward the railroad station and thence by circuitous routes in various localities and nearby towns, where it was observed; that during its course witnesses saw two of the occupants whom they identified as the defendants Sacco and Vanzetti

and who at various times threatened bystanders and railroad crossing tenders with firearms; that on April 17, two days after the murder, the bandit car was found in Manley Woods near West Bridgewater and was afterwards identified by witnesses who had seen it on the morning before the murders and in its travels after the murders; that on the night of May 5 the defendants were observed by a witness, Mrs. Rose Corinne Johnson, in circumstances described in paragraphs numbered 5 and 6 of the opinion, which tended to show consciousness of guilt; that that same night, when they were arrested on a street car, they made motions as though to draw weapons upon the arresting officer; that Vanzetti was then searched and a loaded revolver was found upon him; that Sacco denied that he was armed; that subsequent search produced from Sacco a revolver, and cartridges to fit it, which, expert evidence tended to show, was the revolver from which the bullet that killed Berardelli was fired; that the revolver found on Vanzetti was one which Berardelli had had in his possession shortly before his murder.

Both defendants denied any participation in the crime. Sacco introduced evidence that at the time of the murders he was in Boston seeking to procure a passport; that his actions on May 5 and his carrying of a loaded weapon were due to fear of his being apprehended as a radical because of his activities as a radical socialist and of certain events which had occurred with regard to men of his nationality and views in the city of New York; and that at that time he was preparing with Vanzetti and other associates to get an automobile of an associate named Boda and gather certain literature of a radical nature: "We decided in the meeting in Boston to get those books and papers, because in New York there was somebody said they were trying to arrest all the socialists and the radicals and we were afraid to get all the people arrested, so we were advised by some friends and we find out and Vanzetti take the responsibility to go over to the friends to get the books out and get in no trouble. The literature, I mean, the socialist literature."

Vanzetti's evidence was that he was in Plymouth at the time of the murder and he gave the same explanation as to

his actions on May 5 and his carrying of the weapon as did Sacco. He denied that he procured from Berardelli the revolver found on him at the time of his arrest. There was evidence that he bought it from one Falzini, who had bought it from one Orciani in October, 1919. Orciani was not called as a witness. An argument of the district attorney on the absence of Orciani as a witness is dealt with in paragraph 27 of the opinion, *infra*, 441–443.

The surrounding testimony with regard to the questions asked of the witness Pelser, described in paragraph numbered 8 of the opinion, was as follows: "Q. Do you see in the court room the man you saw shooting Berardelli that day? A. Well, I wouldn't say it was him but he is a dead image of him. [Witness points out Sacco.] — Q. Have you seen him since that time until you saw him in the court room? A. No, sir. — Q. You say you wouldn't say it is him, but he is the dead image of him? What do you mean by that? A. Well, he has got the same appearance. — Q. Have you got any question in your own mind but what he is the man? (Objection and exception by the defendants.) A. I wouldn't say he is the man, but he is the dead image of the man I seen."

The surrounding testimony with regard to the exceptions taken during the testimony of Michael Levangie, described in paragraph numbered 10 of the opinion, was as follows: Levangie had testified that he did not remember talking with Mr. McAnarney, of counsel for Vanzetti. The following then occurred: "Q. Mr. Levangie, when you said that you have no recollection of me talking to you at all, is it because you don't remember my face, my name, or my personality, or what is it? A. I don't remember anything about it whatever. — Q. So that you stand, in the light of all your senses, today your position is that I never spoke to you there at the gate house, whether it is two, three or four weeks ago? A. I don't know." The district attorney objected. The trial judge offered to permit the defendant's counsel to "put it in a direct form, without assuming that to be a fact." The defendant's counsel insisted that he had "a right in cross-examination to assume all that I have assumed in this question," and insisted upon his right to

put the question in the form it was asked. The question and answer were excluded and the defendant excepted.

The witness Tracy, referred to in the paragraph numbered 13 of the opinion, had testified in direct examination, referring to Sacco as he sat in the prisoner's cage, "What do you say as to his identity with the man you saw that day at South Braintree? A. While I wouldn't be positive, I would say to the best of my recollection that was the man."

The witness Fitzemeyer, described in paragraph numbered 17 of the opinion, testifying after refreshing his recollection from records which he had made, in answer to the question, "Now, will you tell the jury, referring to your record to · refresh your recollection, when that revolver was received, what was done upon it, and what was done with it?" stated, that between March 22 and 19, 1920, he had received for repair a "H. & R. revolver, .32-calibre, new hammer, repairing, half an hour," and that the number of the repair job was the same as the number of the one referred to by the previous witness, Wadsworth. Repeated questions by the district attorney to have the witness explain "how your record happens to show '.32-calibre'" were excluded by the trial judge, the judge repeatedly stating that the record was not in evidence and asking the district attorney, "Why are you cross-examining your own witness about something that is not in evidence?" The trial judge finally allowed the following question, "What, if any, distinctions are there between a .32 and .38 Harrington & Richardson revolvers?" and the question was answered, subject to an exception by the defendant, to the effect that ".38 and .32 are the same size frame in an ejector, — hand ejector," which was the style of revolver in evidence as exhibit 27.

The testimony of the defendant Sacco to which the remarks of the district attorney, described in paragraph numbered 20 of the opinion, referred, was as follows: He was shown exhibit 43 and was asked if he knew whose cap it was. He answered, "It looks like my cap." He then was asked, "Did you have such a cap as that in your house at the time of your arrest?" and answered, "Yes, sir, something like . . . . I think it is my cap, yes." Asked to

"look at it carefully," he reiterated, "Yes," and in answer to the question, "There isn't any question but what that is your cap, is there?" he answered, "No, I think it is my cap." He then was asked to try it on, and stated, "A. I don't know. That cap looks too dirty to me because I never wear dirty cap. I think I always have fifty cents to buy a cap, and I don't work with a cap on my head when I work. I always keep clean cap. Right when I go to the factory, take all my clothes off and put overalls and jump. It look to me pretty dirty and too dark. Mine I think was little more light, little more gray." He then was asked, "Is it your cap?" and stated, "I think it is. It look like, but it is probably dirt, — probably dirty after."

Material portions of the charge to the jury, which followed extended instructions regarding the law as to the nature of the crime and the way evidence should be treated by the jury, and as to the presumption of innocence and burden of proof, were as follows:

"As a general rule, the ordinary witness cannot testify to his opinions on questions at issue. He is restricted to evidence that tends to prove facts. To that rule of law there are certain exceptions. One of them includes identification. This being true, the ordinary witness can express his opinion as to the identity of persons and things provided such opinion is based upon personal observation. Therefore, identity becomes an essential fact in these cases that must be proven by evidence, and any evidence that tends to establish such fact is admissible. The law does not require that evidence shall be positive or certain in order to be competent. Over-positiveness in identification might under some circumstances and conditions be evidence of weakness in the testimony, rather than strength. Certainty varies, gentlemen, in degrees. It ranges from the most positive to the slightest degree. Therefore, any evidence that comes within those degrees is competent for the consideration of the jury. Expressed somewhat differently, any evidence that tends in any degree, however slight, to prove a likeness or similarity between the defendants and the assailants is

admissible. The weight or probative effect of such evidence rests exclusively with the jury.

"Therefore, it becomes your sole duty to determine this fact of identity, as well as all other facts involved in these cases, for the court has absolutely nothing to do with the facts. The court determines the law, and has no opinion on the facts. The jury must determine the facts without suggestion or intimation from the court either by speech, gesture, tone of voice or in any manner whatsoever. The law, therefore, places this important responsibility upon you and you must assume it as men of sound judgment, common sense and clear conscience, without fear, sympathy or prejudice.

"Upon the question of identity, the Commonwealth relies upon two kinds of evidence, direct and circumstantial. The direct evidence came from eye witnesses who have testified that they saw the alleged shooting, and from others who claim that they saw one or both of the defendants while escaping in the so called death automobile. Evidence has been offered by both sides. On the one side it is affirmative and on the other it is negative.

"Now, how are you going to determine wherein lies the truth? You must use your best judgment and common sense, your knowledge of human beings and human conduct, your ability to dissect and analyze evidence so that you can separate truth from falsehood and actualities from things imaginary. You should carry also in your minds the fairness and impartiality of each of the witnesses upon both sides, their desire and willingness to tell the truth, their interest, if any, in these cases, their power of vision, their freedom from nervous strain or excitement, their bias or prejudice, their opportunities for observation, the duration of such observation, their reasons for making such observations, and their intellectual qualification which would enable them to actually and reliably reproduce for your consideration what, in fact and in truth, they did or they did not see.

"Therefore, you might naturally say the most important things that would assist you in determining this question of personal identity by direct evidence would be, first, the

intelligence of the witnesses who made the observation, their opportunity for observations, their reasons for making such observations, the duration of such observation and the mental or nervous condition of the witness at the time of making such observations, for you must remember that the witnesses have attempted to reproduce before you what in fact they saw at the time of and immediately following the alleged homicide.

"Therefore, gentlemen, you might say, if you wished, that the most important qualification of the witness that would enable him to present to you a true reproduction of his observation would depend upon his intellectual keenness and the strength of his mentality. For the photographer, in order to take a true likeness of an individual, must have a proper physical equipment. So, too, a witness must have a proper intellectual equipment in order to take a true mental picture of an individual. Of course, coupled with this equipment, either physical or intellectual, the person taking the picture should have a reasonable opportunity so to do. So you see, gentlemen, the question is, whether or not true mental photographs or pictures of these defendants, or either of them, were taken by the witnesses or any of them at the time of the alleged homicide immediately following the same so that they have reproduced correctly such photographs or pictures in your presence and for your consideration.

"I have charged you at considerable length upon this fact of personal identification of the defendants by direct evidence. You must bear in mind, however, that there is other evidence that bears upon this question. The Commonwealth and the defendants, both, make this claim. This is so because personal identification by witnesses is only one link in the chain of evidence to which you must give full consideration. One piece of testimony standing alone by itself may be weak or strong. Another piece of testimony separated from all the rest may be weak or strong, but you must consider the evidence in its entirety, for the real test is this: Whether or not you are satisfied to a reasonable and moral certainty from all the evidence introduced on both sides that the defendants, or either of them, were at South

Braintree on the day in question. This evidence applies not only to the affirmative testimony of the Commonwealth which tended to prove the presence of the defendants at South Braintree at the time when said homicides were committed, but also to the negative testimony introduced by the defendants which tended to prove their absence.

"For instance, the defendants claim you must consider with care the evidence tending to prove an alibi, for the reason that, if they were .elsewhere when the alleged homicides were committed, that is evidence which tends to corroborate the witnesses of the defendants to the effect that they were neither at the place when the alleged homicides were committed, nor were they in the bandit car. In regard to the evidence of an alibi, I shall consider that matter more in detail later.

"Now, the Commonwealth claims that there are several distinct pieces of testimony that must be considered upon the question of personal identification. Let us see what they are. First, that the fatal Winchester bullet, marked Exhibit 3, which killed Berardelli, was fired through the barrel of the Colt automatic pistol found upon the defendant Sacco at the time of his arrest. If that is true, that is evidence tending to corroborate the testimony of the witnesses of the Commonwealth that the defendant Sacco was at South Braintree on the fifteenth day of April, 1920, and it was his pistol that fired the bullet that caused the death of Berardelli. To this effect the Commonwealth introduced the testimony of two witnesses, Messrs. Proctor and Van 'Amburgh. And on the other hand, the defendants offered testimony of two experts, Messrs. Burns and Fitzgerald, to the effect that the Sacco pistol did not fire the bullet that caused the death of Berardelli.

"Now, gentlemen, what is the fact, for you must determine this question of fact, and when determined it may be of assistance to you in determining the ultimate fact. Of course, this evidence cannot be considered by you in any manner whatsoever against the defendant Vanzetti unless you find as a fact that he, too, was present aiding and assisting Sacco and the other conspirators in the shooting and

killing of Berardelli. Although I have referred only to the killing of Berardelli, you must bear in mind there is no claim but that the same persons who are responsible for the death of Berardelli are equally responsible for the death of Parmenter. This is so, because, as I have told you, both of the deceased were killed at practically the same time by the same joint principals or conspirators actuated by the same motives and purposes.

"Second, that the deceased Berardelli had a revolver, that immediately following his death none was found in his clothing, that Berardelli about three weeks before his death, in company with his wife, left said revolver with the Iver Johnson Company of Boston for the purpose of having a new spring put into it, that according to the foreman of the repair shop of Iver Johnson Company a new spring and hammer were put into an H. & R. revolver that had a repair tag number upon it of 94765, which number was given to the repair job by the person who took the revolver from Berardelli at the time it was left to be repaired; that on the Saturday night previous to the shooting some witness testified that a revolver in the hands of Berardelli, — he saw in the hands of Berardelli, was something similar to the one he had previously seen with Berardelli.

"Now, the Commonwealth claims that if this revolver, found or taken from the defendant Vanzetti, was taken by him at the time of the killing of Berardelli, that is evidence tending to corroborate the witnesses of the Commonwealth that the defendant Vanzetti was in the bandit car and, therefore, was present at the time of the alleged shooting at South Braintree. You must therefore see that the new hammer and spring may become a very important feature in the identity of this revolver.

"I have stated to you the claim of the Commonwealth with reference to this Harrington & Richardson revolver. You must remember now, on the other hand, the defendants have offered testimony tending to prove that said revolver never was the property of Berardelli, but, having passed through several hands, it became the property of the defendant Vanzetti, and that, according to the testimony of

the two experts, the said Messrs. Burns and Fitzgerald, no new spring and hammer were put into said revolver by the employees of said Iver Johnson Company.

"Here again, gentlemen, is another controverted question of fact which you must determine. What is the truth? For the truth will assist you in arriving at a conclusion. Of course, this evidence is not competent against the defendant Sacco, because there is no suggestion that the Berardelli revolver was used by either of the so called bandits in causing the death of either Berardelli or Parmenter. Therefore, this evidence must be limited in its probative effect, it if has any, to Vanzetti alone.

"Third, that there is evidence tending to prove that a cap was found near the body of Berardelli; that said cap was in general appearance and color like that worn by the defendant Sacco; and that the defendant Sacco was seen going away without any cap upon his head. Now, the Commonwealth claims that if this cap belonged to Sacco it could not have been found near the dead body of Berardelli unless the defendant Sacco lost it at the time of said shooting. If, then, he lost it at that time, you have a right to say that he was then present.

"On the other hand, you should remember that the defendant Sacco and his wife both have testified that said cap never belonged to the defendant, and that he never owned it, and if that is true, it should not be considered by you as evidence against him. Again, gentlemen, you have another controverted question of fact. What is the truth? Having ascertained that, apply it accordingly. Of course, this evidence cannot be considered as competent evidence in any way against the defendant Vanzetti.

"There is another piece of testimony to which I specifically call your attention, because the Commonwealth claims that such testimony tends to prove, and in fact proves, a consciousness of guilt on the part of these defendants. You must therefore follow me with great care while I explain to you the legal meaning of this expression so that you may apply correctly the law to the facts found by you to have been established; for, you must notice that I said, 'to established

facts.' This is so because facts must be established in order to make application of this principle of law. In these cases on trial, if the evidence does not establish facts from which guilt of the crime alleged in these indictments may be inferred, then you will eliminate entirely from your consideration such evidence, because there are no facts proven to which you can apply this law of consciousness of guilt.

"The entire record, gentlemen, of every person's life is safely locked up in the vault of the human brain. No human eye has ever scanned a line of that record, and no human intelligence has ever seen that brain in action, and although we know this to be true, yet we also know at the same time that this same brain directs and controls all actions of the human body and its members. Therefore, the mind is the mental pilot in command and the body obeys. The body, without the mind, is like the vessel at sea without its rudder, or the automobile without its steering wheel and without which both would be helpless and without control.

"If, then, the mind directs and controls the movements of the body, and it is safely protected from human view from without, how, then, can the jury ascertain the real facts and purposes of such mind within? My answer is, by a true interpretation of the external bodily signs and manifestations that appear from without, just as the mind of the deaf and the dumb is interpreted by the movement of the finger tips from without. In other words, speech, physical acts, movements and manifestations of the body and its members translate into human language the thoughts, intentions, knowledge and even the secrets of the mind within. As the speedometer automatically records mile after mile as the automobile proceeds on its journey, so the human brain records every act by the human body and its members pursuant to its direction, whether such act be lawful or unlawful, guilty or innocent.

"Therefore, the mind being conscious of every bodily act theretofore committed, it knows whether or not such act is one of innocence or guilt. If it indicates guilt, that is evidence of consciousness of a guilty act, and evidence of a consciousness of a guilty act is evidence tending to prove

commission of such guilty act, and evidence of the commission of a criminal act tends to prove the identity of the author of such criminal act. To be more specific, the real question is, do the actions, conduct and speech of the defendants on the night of May 5, 1920, and at other times, indicate that their minds were then conscious of having committed some crime? If they do, then the probative effect of such consciousness must be determined by the jury.

"You must remember, however, gentlemen, what I have already told you, that consciousness of guilt depends upon proof of established facts. Therefore, if the Commonwealth has satisfied you of such established facts from which you find a consciousness of guilt on the part of these defendants, or either of them, then you may consider such facts in connection with all the other facts established, if any, as bearing upon their guilt of the crimes set forth in these indictments, which allegation is murder.

"This being true, if, then, the defendants were only consciously guilty of being slackers, liable to be deported, fearing punishment therefor, and were not consciously guilty of the murder of Berardelli and Parmenter, then there is no consciousness of guilt during the time they were at the Johnson home, because the defendants are solely being tried for the murders of Berardelli and Parmenter, and for nothing else. In addition to what I said as to the consciousness of guilt of these defendants in regard to their conduct and movements while at the Johnson house, it equally applies to all the other evidence of consciousness of guilt in these cases for the same reason that I have given you, namely, that these defendants are being tried for the murders of Berardelli and Parmenter, and for nothing else. For the law requires that there must be a causal connection or some probative relationship between the evidence tending to prove a consciousness of guilt and the crime charged in the indictments.

"But the Commonwealth claims that all the evidence of the declarations, conduct and movements of the defendants while at the Johnson house, at subsequent times thereto and on subsequent occasions, tends to prove a consciousness of guilt of the murders of Berardelli and Parmenter. This is on

the ground that the evidence is consistent only with the consciousness of having committed the crime of murder and inconsistent with any other theory. While, on the other hand, the defendants claim that if there was any consciousness of guilt at all it did not refer to the murders of Berardelli and Parmenter but to some punishment that they or their friends might receive for being slackers, which might include deportation, as well as some other form of punishment.

"So you see, gentlemen, here is another controverted question of fact which you must determine. Now, gentlemen, on this question, again, what is the truth?

"Now, let me state to you the salient parts of the testimony that may have some bearing upon this question of consciousness of guilt, in order that you may understand and more intelligently apply the principles of the law upon this subject to the facts found by you to have been established. There seems to be no dispute about some matters as to what took place on the night of May 5, 1920, at the Johnson house. It is admitted that Sacco and Vanzetti, Orciani and Boda were at or near the Johnson house on that night at about 9:20 P.M.; that the two defendants were arrested on an electric car while returning from West Bridgewater to Brockton; that while in said car a Harrington & Richardson revolver of 38 calibre, loaded with five bullets, was taken from the defendant Vanzetti; that a Colt automatic pistol, fully loaded, of 32 calibre, together with 32 bullets, was taken at the Brockton police station from the person of the defendant Sacco. When I say "32 bullets," if I recall the testimony, that includes the loose bullets in the pocket together with the cartridges that were in the pistol at that time.

"As to what actually took place at the Johnson house, in the electric car, and at the Brockton police station, the parties are at great variance. At the time Mrs. Johnson went over to the Bartlett house, a distance of about sixty feet from her house, did the defendants follow her? Did they remain outside for about ten minutes while she was inside the Bartlett house, telephoning the West Bridgewater police? While Mrs. Johnson was in the house, did she see

the light of a motorcycle flashing back and forth on one side and on the other? If she saw this, what was its purpose? Were there telephone wires connected with the Bartlett house that could be seen from the street? Were the defendants conscious of or suspicious of what Mrs. Johnson was doing in the Bartlett house? Did that consciousness have anything to do with their departure? The Commonwealth claims it did.

"The defendants say first, that they did not follow Mrs. Johnson over to the Bartlett house and, secondly, that they left without taking the Overland automobile because there were no number plates on it.

"Now, what is the truth? There again you see, gentlemen, there is a direct conflict between the parties. The Commonwealth claims that they left because of a consciousness of what happened at the Bartlett place. The defendants say no, they left because there were no number plates which they could put upon the Overland car and therefore they left it intending to return for it the next morning.

"Now, then, the question you must determine is this: Did the defendants, in company with Orciani and Boda, leave the Johnson house because the automobile had no 1920 number plate on it, or because they were conscious of or became suspicious of what Mrs. Johnson did in the Bartlett house? If they left because they had no 1920 number plates upon the automobile, then you may say there was no consciousness of guilt in consequence of their sudden departure, but if they left because they were consciously guilty of what was being done by Mrs. Johnson in the Bartlett house, then you may say that is evidence tending to prove consciousness of guilt on their part.

"But still, you must remember that such consciousness of guilt, if you find such consciousness of guilt, must relate to the murders of Berardelli and Parmenter and not to the fact that they and their friends were slackers and liable to be deported therefor or were even afraid that some kind of punishment might come to them.

"So you see, gentlemen, here is another question of fact. They are directly opposite to each other, and you must de-

termine what is the fact. You must find in your mind what was the fact on that night, because you must apply the law only to facts known to exist. The law . . . should be applied only to facts that are true, and therefore, here, before you can apply this principle of the law as to what took place upon that occasion, you must first determine the facts, because the parties are at great variance upon this question.

"The next question that you might consider would be what actually took place in the electric car and the automobile when the defendants were arrested and immediately following after that. Is the testimony of Officer Connolly true, in that Vanzetti put his hand in his hip pocket? Did Officer Connolly say to Vanzetti, 'You keep your hands out on your lap or you will be sorry'? Did his fellow officer, Mr. Spear, hear Officer Connolly make this statement to Vanzetti? This is a question of fact you must again determine. The court admitted this testimony of Officer Spear, not for the purpose of proving that Vanzetti put his hand in his hip pocket, but simply for the purpose of corroborating Officer Connolly to the effect that he heard said Connolly make the statement.

"Now, you have a right to say that this is a very important question that you must determine. Its importance, as I have told you, depends upon what you find the fact to be. The Commonwealth claims that the defendant Vanzetti put his hand in his hip pocket for the purpose of using a revolver upon the arresting officer in order that he or both he and Sacco might escape.

"The defendants have testified that nothing of that kind happened. Again, what is the truth? If the defendant Vanzetti intended to do violence to the arresting officers or either of them if it had not been for the command of Officer Connolly, from this evidence you may find consciousness of guilt on the part of the defendant Vanzetti, but not against Sacco; and if you find that Vanzetti did so intend to use his revolver, that is evidence tending to prove self-consciousness of guilt of some crime committed by him. If it proves such self-consciousness, then you will naturally ascertain the

nature, character and gravity of the crime committed. If a person is willing to use a deadly weapon such as a revolver upon an arresting officer in order to gain his liberty, you have a right to ask what would naturally be the nature, character and gravity of the crime committed. But you must bear in mind, as I have told you, that Vanzetti and Sacco both have testified that nothing of the kind happened in the electric car or at any time, so far as the defendant Vanzetti is concerned. If there was on the part of Vanzetti no intention or thought of using a revolver upon either of the arresting officers, then, of course, you will find from this evidence no consciousness of guilt of that fact.

"I might say, further, it is not sufficient that Officer Connolly thought either of the defendants were to draw a revolver by the manifestations made. The real question is as to the mental state of either and both defendants Vanzetti and Sacco at that time. Did either of them or both of them, as has been testified, have in their minds the desire and the purpose and intention of drawing and using a revolver upon either of the arresting officers? You heard the testimony of the officers. You heard what they said. You heard about the manifestations and actions of the members of the body, to wit, the arms. The question is, first, did either Vanzetti or Sacco make such movements? The defendants deny it. If they did make such movement, did they, the two defendants, or either of them, intend by what they did to use their revolvers, or did they make the movement for the purpose of reaching for their revolvers for the purpose of protecting themselves against the officers? Now, gentlemen, again there is a question of fact and you must draw such conclusions, if any, that should be drawn from the fact that you find to have been established.

"I will not dwell further upon the testimony with reference to the defendant Sacco. A simple statement of the law with reference to the defendant Vanzetti applies to Sacco. What was on Sacco's mind at that time? Did he make one movement or two movements toward the front of his body? Did he make such manifestations? He denies it. And if he did, what did he have in mind at that time; not what the officer

had in mind. What did Sacco have in his mind? Did he make that movement? Did he make, did he reach toward his pocket or toward the front of his clothing? Did he do that? If he did it, what was then Sacco's mind? Did he reach for the purpose of getting a revolver or pistol? If he did, then you have a right to say whether or not that was consciousness or evidence of consciousness of guilt so far as the killing of Berardelli and Parmenter is concerned. And this evidence, of course, against the defendant Sacco cannot be considered in any way against the defendant Vanzetti.

"There are two pieces of testimony to which I should call your attention. One is the testimony of Chief Stewart, as to a conversation between him and the two defendants immediately following the arrest; and the other is the statement of both defendants to District Attorney Katzmann on May 6, 1920, at the Brockton police station. What I told you during the trial I now repeat: That the statements made by one of the defendants can be used only against him and not against the other. In other words, the statements made by Vanzetti must relate to him alone and not to Sacco; and the statements made by Sacco must relate to him alone and not to Vanzetti.

"In the first place, gentlemen, let me say to you that the law protects persons who are under arrest from making any statement to police officers or to third persons. Therefore, under our laws silence by a person under arrest cannot be taken as an admission against him, although he may be questioned by a police officer or such third person, but if he sees fit to voluntarily talk and during such talk makes an admission, such admissions may be used against him at the trial. The officer is under no obligation, as a matter of law, to warn a person of his rights who is under arrest. The law does, however, require that such statement made by a defendant shall be voluntarily and freely made. That is, they should be made without coercion, threats, duress, intimidation, inducement, or offer or hope of reward.

"So the real test is that such statements or admissions shall be voluntarily made. This is so because the law says that such statements are presumed to be made voluntarily

until evidence has been introduced to the contrary, although a defendant has not been even warned of his rights. In these cases, however, it is admitted that both defendants were informed by Chief Stewart and District Attorney Katzmann that they were under no obligation to talk. Therefore, if they did see fit to talk, whatever they said might be used against them if such statement were voluntarily made and such statements, whatever they were, can be used, as I have told you, only against the utterer and against nobody else; and such statements that have been made, if they tend to prove a consciousness of guilt, such a consciousness of guilt must relate solely to the murders of Berardelli and Parmenter.

"I am not going to state even the salient part of these statements, partly because it would require too much time, but particularly because it is your duty to remember, to the best of your ability each and all of such statements. But the Commonwealth claims that many statements were made by each of these defendants to prove a consciousness of guilt and that such consciousness of guilt, in connection with other established facts, proves consciousness of guilt of the murders of Berardelli and Parmenter.

"Now, the law says that intentional false statements, deception and concealment of truth are evidences of consciousness of guilt and can be used against a defendant when, and only when, such consciousness relates to the crime charged in the indictment. That false statements were made by both of these defendants is admitted. This being true, you must determine their purpose, object and intent in making them. Did they know that Berardelli and Parmenter had been murdered? Did they realize and appreciate that they were being held in connection with these murders? Did they make false statements for the purpose of taking away suspicions from them of these murders? Did they knowingly make false statements as to their whereabouts on the day of the murders for the purpose of deceiving both Chief Stewart and District Attorney Katzmann and eventually for the ultimate purpose of establishing their innocence of the crimes charged? If you find those

statements were false and known to be false by these defendants and were made by them for the purpose of deceiving both Chief Stewart and District Attorney Katzmann so that suspicion of the murders of Berardelli and Parmenter would be removed from them, then such false statements made under such circumstances is evidence of consciousness of guilt against them.

"Now, in answer to this claim of the Commonwealth, — and I have only stated the claim of the Commonwealth, — the defendants say that although said statements were false, yet they were not made for the purpose of deceiving Chief Stewart or District Attorney Katzmann in regard to any fact whatsoever that had any relationship to the murders of Berardelli and Parmenter, because they said they had no knowledge whatsoever at that time of the murders of Berardelli and Parmenter. But they do, however, say that they made them to protect themselves and their friends from some kind of punishment, either by way of deportation because they were radicals, or because of their activities in the radical movement, or because of radical literature that they then had possession of.

"Again you have another controverted question of fact, the truth of which you must determine. If, then, such statements were made for the purpose of deception in regard to the facts relating to the murders of Berardelli and Parmenter, then you may consider such statements, as I have said before, as evidence of consciousness of guilt against them. If they were not made for such purpose or if they were made for any purpose whatsoever other than the concealment of the facts relating to such murders, then you will give the evidence no further consideration whatsoever.

"It would seem unnecessary and inadvisable for me to consider any further with you the evidence concerning any issue herein involved of which the Commonwealth, has introduced affirmative testimony. All of the essential features I feel have been considered and covered so far as the law is concerned, but there remains for me to consider with you the defence of alibi that has been raised by these defendants. It is sometimes called a plea of not guilty, because as the

defendants say in these cases that they were elsewhere at the
time the alleged crimes were committed at South Braintree
and therefore they could not have committed them.    In
other words, the defendants say it was physically impossible
for them to have committed these crimes because at the
very moment they were committed Vanzetti was in Plym-
outh and Sacco was in Boston.    If you find such to be the
fact — as it is purely a question of fact — then that would be
a complete defence to these indictments and therefore you
should return verdicts of not guilty.

"An alibi is always a question of fact.    Therefore, all
testimony which tends to show that the defendants were in
another place at the time the murders were committed tends
also to rebut the evidence that they were present at the
time and place the murders were committed.    If the evi-
dence of an alibi rebuts evidence of the Commonwealth to
such an extent that it leaves reasonable doubt in your minds
as to the commission of the murders charged against these
defendants, then you will return a verdict of not guilty.

"On the other hand, if you find that the defendants or
either of them committed the murders and the Common-
wealth has satisfied you of such fact beyond reasonable doubt
from all the evidence in these cases, including the evidence
of an alibi, then you will return a verdict of guilty against
both defendants or against such defendant as you may find
guilty of such murders."

On July 14, 1921, each defendant was found guilty of
murder in the first degree.

On July 18, each defendant filed a motion for a new trial.
On November 8, 1921, the defendants filed the first supple-
mentary motion for a new trial, which is called in the opinion
the "Ripley" motion, which was supported by affidavits de-
scribed in the opinion.    On October 21, 1923, a supplement
to the Ripley motion was filed.

On May 4, 1922, the defendant Sacco filed a second sup-
plementary motion for a new trial called the "Gould"
motion.

On July 22, 1922, there was filed by the defendant Sacco
a third supplementary motion for a new trial, and on Sep-

tember 11, 1922, a fourth supplementary motion for a new trial. The third and fourth supplementary motions for a new trial are not before this court upon the record.

On March 9, 1923, occurred the purported appointment of Mr. Katzmann as special assistant district attorney, which was subject to exception by the defendants and which is discussed in paragraph numbered 28 of the opinion.

On April 30, 1923, the fifth supplementary motion for a new trial was filed by the defendant Vanzetti.

The Gould motion, referred to in paragraph numbered 33 of the opinion, was based on affidavits that one Roy E. Gould had been an eyewitness of the crime, standing not less than five feet nor more than ten feet from the automobile as it proceeded up Pearl Street from the scene of the shooting, and had an unobstructed view of the person sitting on the front seat to the right of the driver, who had fired a shot at him which had gone through his overcoat, and that Gould would have testified that the defendant Sacco was not the person who was sitting on the front seat; that Gould had given his name and address to the chief of police at South Braintree; that the defendants and their counsel had made diligent search for Gould and had been unable to find him until after the trial; and that the Commonwealth, although they had his name and address, made no effort to discover his whereabouts.

The grounds of the other motions are described in the opinion.

The motions were heard and denied, and on October 1, 1924, the trial judge filed separate decisions accompanying his order denying the first and the fifth supplementary motions.

The trial judge, in a long statement filed by him of findings and reasons for denying the Proctor motion, to which the paragraph of the opinion numbered 32 refers, set forth:

"In my judgment, the questions propounded by . . . [the assistant district attorney] were clearly put, fairly expressed, and easily understood; they have been so commonly used by experienced trial lawyers throughout the Commonwealth for so many years that they have become

almost stereotyped questions. It cannot be said that Captain Proctor did not have time to fully understand and appreciate the full meaning of the questions propounded to him, because the first one was put twice to him before he answered. . . .

[After an extended analysis of reasons for disbelieving the affidavit of Captain Proctor.] ."I sincerely hope that I have not dealt unkindly or unfairly in what I have said concerning this affidavit. I fully appreciate the fact that age had left its heavy burden upon this man's shoulders, after a great many years of honorable service to the Commonwealth. But it must be remembered that it was his affidavit that has made it very distasteful and unpleasant to me in determining the merits of this motion. For it must also be remembered that it was he who charged the District Attorney, Mr. Katzmann, and his then assistant, Mr. Harold P. Williams, with misconduct in their respective offices, which misconduct assailed their honor, their integrity, and their solemn obligation that they were then under to the Commonwealth, to the defendants and to the court; for it must ever be borne in mind that their honor, reputation and high standing at the bar were dear and precious to them; and, before these excellent human traits, which are so essential and important to every honorable lawyer throughout the Commonwealth, are taken away (traits of character which, if taken away, can never be restored), they have a perfect right to ask that their accuser shall furnish evidence against them that is clear, satisfactory and convincing. Metaphysical argument and illogical conclusions based thereon by skilful counsel should never prevail against pure logic that is based upon established facts.

"Therefore, in determining the merits of this motion, I have endeavored, to the best of my ability, to ascertain what are the facts, because such ascertainment is the only guiding star to truth; for the ascertainment of truth in all controverted questions of fact is and always has been the supreme command of the law, and as long as we obey it, the safety and protection of the people of the Commonwealth will rest secure.

"With my findings of facts, it is unnecessary for me to state at length and in detail the contents of the counter-affidavits of Messrs. Katzmann and Williams, — they are clear and convincing. I cannot, however, close this phase of the matter without saying that I carefully watched the conduct of both Messrs. Katzmann and Williams in the trial of these cases for nearly seven weeks, and I never observed anything on their part but what was consistent with the highest standard of professional conduct.

"For the reasons hereinbefore given and others not herein specifically mentioned, I find that the defendants have not established, by a fair preponderance of the evidence, any of the material allegations in the so-called Proctor affidavits which would warrant me in granting a new trial. Therefore, exercising every authority vested in me by law that relates to the granting of motions for new trials, I decline to grant this motion for a new trial on the Proctor affidavit, and the same is herein and hereby denied."

Other material facts and rulings are described in the opinion.

*W. G. Thompson,* (*R. Spring, G. E. Mears, & R, H. Wiswall* with him,) for the defendants.

*D. P. Ranney,* Assistant District Attorney, (*W. M. Wilbar,* District Attorney, *& W. P. Kelley,* Assistant District Attorney, with him,) for the Commonwealth.

BRALEY, J. A company of shoe manufacturers, described in the record as Slater & Morrill, Inc., was, on April 15, 1920, doing business in that part of the town of Braintree in the county of Norfolk in this Commonwealth known as South Braintree. The paymaster of the company, Frederick A. Parmenter, accompanied by a guard, Alexander Berardelli, on that day left the upper office or factory of the company referred to as "Hampton House" at about three o'clock in the afternoon, with the sum of $15,776.51 contained in two boxes, which sum was the amount of the payroll to be taken to the company's lower factory on Pearl Street where it was to be disbursed to their employees. In making the journey they crossed the tracks of the New York, New Haven and Hartford Railroad, passed easterly along Pearl Street,

and, while walking opposite the factory of the Rice and Hutchins, Incorporated, which abutted on the southerly side of that street about two hundred and fifty feet from the lower factory, were attacked by two or more armed men who shot them down inflicting wounds from which death ensued. The boxes were seized by the robbers and placed in an automobile which was coming westerly through Pearl Street almost, if not quite, simultaneously with the shooting, and which, after it had been boarded by the murderers, was driven rapidly away. It was undisputed that Parmenter and Berardelli were shot and killed while in charge of the payroll, in the daytime, on a public highway, by some members of a group of men who seized the money and made their escape in an automobile. The Commonwealth claimed that the defendants, in concert of action with members of the group, being armed with dangerous weapons, committed the robbery in the accomplishment of which they killed Parmenter and Berardelli. G. L. c. 265, §§ 1, 17. G. L. c. 274, §§1, 2. The grand jury, September 11, 1920, returned indictments charging the defendants as principals, and, each having been convicted of murder in the first degree, the cases are before us on exceptions taken at the trial and exceptions taken to the denial of various motions for new trials.

Before taking up the exceptions, some preliminary questions must be decided.

A part of the record designated as "Corrections of errors and omissions in bill of exceptions allowed October 2, 1924, and printed, but not yet entered in the Supreme Judicial Court; and a statement of certain material circumstances occurring since the trial," contains this statement as to the sanity of the defendant Vanzetti as of the time the exceptions to the denial of the motions for new trials were presented and allowed: "Doubt has arisen in the mind of the court and also of counsel for the government and counsel for both defendants, whether, without an adjudication that the defendant Vanzetti is sane or has been restored to sanity, counsel have any right to act for him in the presentation of any of the supplemental bills for allowance, and whether

the court, although finding the bills otherwise proper for allowance, has any right to allow the same in favor of Vanzetti, and also whether said bills of exception can properly be printed and entered in the Supreme Judicial Court and argued therein in the absence of such adjudication. In the absence, so far as is known, of any explicit provision of law for submitting this question to the Supreme Judicial Court, the facts have been set out in this paper and are submitted to the Supreme Judicial Court under its general jurisdiction to regulate the administration of justice, for such action as to that court may seem just and in accordance with law." No question was raised as to the sanity of Vanzetti during the trial or when the principal bill of exceptions relating thereto was settled and allowed on September 13, 1924, but on December 30, 1924, the State expert for insane criminals and the physician of the State prison signed and sent to a judge of the Superior Court a communication stating that "Bartolomeo Vanzetti, sentenced August 16, 1920, from Plymouth to serve from twelve to fifteen years for assault with a dangerous weapon with intent to rob, was examined by us today." They further state that after examination on October 22, 1924, and December 24, 1924, and from his appearance on December 30, 1924, "We believe he is insane and also consider him to be a dangerous person and recommend that he be transferred to the Bridgewater State Hospital." Prior to the filing of the report, an expert, employed in behalf of Vanzetti, confirmed their findings and concurred in their opinion, although Vanzetti himself had at times expressed an opinion that he was not insane and that his removal from the State prison would not be justifiable. The court found Vanzetti to be insane, and on January 2, 1925, issued a warrant to the warden of the State prison directing him to remove Vanzetti from the State prison to the Bridgewater State Hospital and deliver him to the superintendent thereof. The warrant was executed and return duly made and pursuant thereto Vanzetti became an inmate of the said hospital on January 2, 1925.

By G. L. c. 123, § 2, it is provided that "The Commonwealth shall have the care, control and treatment of all

insane . . . persons"; and by § 1, the words "Commissioner" and "Department" used in the statute shall, unless the context otherwise requires, mean respectively "commissioner of mental diseases" and "department of mental diseases." The sections under which Vanzetti was committed are as follows:

"Section 102.   The department shall designate two persons, experts in insanity, to examine prisoners in the State prison, the Massachusetts reformatory, the prison camp and hospital or the reformatory for women, alleged to be insane. If any such prisoner appears to be insane, the warden or superintendent shall notify one or both of said experts, who shall, with the physician of such penal institution, examine the prisoner and report the result of their investigation to the Superior Court of the county where such penal institution is situated or to the appropriate district court mentioned in the following section.

"Section 103.   The Superior Court upon a report under the preceding section, if it considers the prisoner to be insane and his removal expedient, shall issue a warrant, directed to the warden or superintendent, authorizing him to cause the prisoner, if a male, to be removed to the Bridgewater State Hospital, and, if a female, to be removed to one of the State hospitals for the insane, there to be kept until, in the judgment of the superintendent and the trustees of the institution to which the prisoner has been committed, he should be returned to prison. . . .   When the superintendent and trustees determine that the prisoner should be so returned, they shall so certify upon the said warrant, and notice, accompanied by a written statement regarding the mental condition of the prisoner, shall be given to the warden or superintendent of such penal institution, who shall thereupon cause the prisoner to be reconveyed thereto, there to remain pursuant to the original sentence, computing the time of his detention or confinement in the said hospital as part of the term of his imprisonment."

The powers and duties of the trustees of the hospital were by St. 1919, c. 199, § 1, transferred to the director of prisons, and his powers and duties were by St. 1919, c. 350, §§ 82–84,

86, vested in the head of the Department of Correction under the title "commissioner of correction." See G. L. c. 124. It follows that the order of the commissioner of correction and of the superintendent of the hospital, indorsed on the copy of the warrant on April 21, 1925, that "Bartolomeo Vanzetti ought to be returned to the Charlestown State Prison" with the written statement of the medical director of the hospital, that he believed Vanzetti to be "normal mentally" was in accordance with the statute. The warrant of the court determined only that he was insane when the warrant was issued; and the order for his return showed that he had recovered. It must be assumed that, no further inquiry having been applied for, he was mentally competent to retain and instruct counsel to protect his legal rights then pending before the court. *Commonwealth* v. *Spencer*, 212 Mass. 438, 442, 443. No subsequent change in Vanzetti's mental condition having been suggested at the argument before us, the presumption of his sanity is controlling.

It is generally contended by the Commonwealth that the various motions for new trials were filed too late and that the trial court had no jurisdiction to pass on them. By G. L. c. 278, § 29, the Superior Court at the sitting in which an indictment is tried or within one year thereafter upon motion in writing of the defendant may grant a new trial for any cause for which by law a new trial may be granted or if it appears to the court that justice has not been done, and upon such terms or conditions as the court shall order.

It having been decided in *Commonwealth* v. *Rollins*, 242 Mass. 427, that under this statute the Superior Court had no jurisdiction on May 5, 1920, to entertain a motion by the defendant for a new trial for murder on the ground of newly discovered evidence where a verdict of guilty had been returned June 8, 1918, even if no sentence yet had been passed, the Legislature amended this statute by St. 1922, c. 508, so as to empower the Superior Court "at the sitting in which an indictment is tried, or within one year thereafter, or, in capital cases, within said year or at any time before sentence, upon motion in writing of the defendant, [to] grant a new

trial for any cause for which by law a new trial may be granted or if it appears to the court that justice has not been done, and upon such terms or conditions as the court shall order." The amendatory act provided in § 2, that it should take effect upon its passage. It was approved June 6, 1922, and not being subject to a referendum which, among other things, excludes all legislation relating to the powers of courts, the statute was in effect on June 6, 1922. Art. 48 of the Amendments to the Constitution, "The Referendum" I, III, § 2. G. L. c. 4, § 1. *Kennedy* v. *Palmer*, 6 Gray, 316. The statute is remedial in character and is applicable to the cases at bar. *Bigelow* v. *Pritchard*, 21 Pick. 169. *Toupin* v. *Peabody*, 162 Mass. 473, 476. *Holt* v. *Holt*, 253 Mass. 411. The motions, therefore, were seasonably filed.

We now come to the questions raised by the exceptions which will be considered substantially in the order in which they were presented by counsel for the defence.

1. It is contended that the conduct of the court with reference to the defendants' demurrer requires that the cases be remanded for a decision thereon. The record of "Corrections of errors and omissions," states that "On May 31, 1921, before the commencement of any proceedings in open court, counsel on behalf of both defendants, together with counsel for the Commonwealth, took up with the court in chambers the question of withdrawing the plea of not guilty on behalf of both defendants, and (1) the filing of demurrers on behalf of both defendants in both cases . . . (2) the filing of an application for a separate trial on behalf of the defendant Sacco in both cases . . . and (3) the filing of a demand for a bill of particulars on behalf of both defendants . . . on the merits of these various pleadings. . . . the court allowed the motion to file the demurrers . . . . No decision was ever made on these demurrers." The docket entries show that each defendant pleaded not guilty September 28, 1920, and on May 31, 1921, the sitting opened and the defendants were placed on trial. On the same day the defendant Sacco filed a motion for a separate trial, and each defendant also moved for a bill of particulars and demurred to the indictment. The defendants did not press for a decision, but apparently

were content to go to trial on the merits, after the empanelling of the jury without exception, and the failure of the judge to act shows no error.

2. The joint and several motions of the defendants for a bill of particulars were in accordance with G. L. c. 277, § 40, that "The court may, upon arraignment of the defendant, or at any later stage of the proceedings, order the prosecution to file a statement of such particulars as may be necessary to give the defendant and the court reasonable knowledge of the nature and grounds of the crime charged, and if it has final jurisdiction of the crime, shall so order at the request of the defendant if the charge would not be otherwise fully, plainly, substantially and formally set out." If to prepare for his defence the defendant desires information as to the time and place of the alleged crime or the means by which it is alleged to have been committed, he may apply for a bill of particulars. A bill of particulars does not enlarge the scope of the indictment, nor specify a charge not covered by it. Its only purpose is to specify more particularly the acts constituting the offence. *Commonwealth* v. *Kelley,* 184 Mass. 320, 324. "If the indictment alone is not sufficiently full to give to the defendant his constitutional rights, he is entitled to a bill of particulars as an absolute right." *Commonwealth* v. *Sinclair,* 195 Mass. 100, 105. The indictments at bar were good at common law. The time and place of the assault and beating of Parmenter and Berardelli, the residence of each defendant, the intent of the defendants to murder Parmenter and Berardelli by shooting them in the body with a loaded pistol and that they by such assault did murder Parmenter and Berardelli, are specifically stated and charged. The character of the crime was fully, plainly, substantially and formally set out. *Commonwealth* v. *Webster,* 5 Cush. 295. "Details of the assault, particularly respecting the cause of death, and precise nicety as to the relation of the beating to the fatal result, are not required." *Commonwealth* v. *Wakelin,* 230 Mass. 567, 571. The indictments also were sufficient under the statute. *Commonwealth* v. *Min Sing,* 202 Mass. 121, 131, 132. *Commonwealth* v. *Jordan,* 207 Mass. 259. G. L. c. 277, § 79. It further

appears that after the jury had been empanelled, the sheriff, by consent of the district attorney and counsel for the defence, was made the custodian of certain weapons and bullets subject to examination by an expert for the defendants. The judge then said: "The motion for separate trial is overruled, to which order each of the defendants excepts. The other order you asked for . . . ." Interrupting the judge, defendants' counsel said: "Bill of particulars, or the order, that has been granted in part, and under the court's assurance that anything else . . . ." THE JUDGE. "The rest remains open." COUNSEL: "The granted part referring to the revolvers and the bullets. The defendant asks an exception in so far as the other matters referred to in the bill of particulars." THE DISTRICT ATTORNEY: "You can't take an exception to an order that is not a denial." COUNSEL FOR THE DEFENCE: "In so far as the parts not granted to the bill of particulars." THE JUDGE: "There has not been anything denied." COUNSEL FOR THE DEFENCE: "There are other matters than the bullets and revolver." This colloquy continued with the result that no further order or ruling was made nor was the attention of the judge again called to the question, and the clerk, without objection by the defendants, read the indictments to the jury. The question of separate trials was discretionary. "The mere fact that admissions have been made by one which are not evidence as against the other is not a conclusive ground for ordering the parties to be tried separately." *Commonwealth v. Bingham*, 158 Mass. 169, 171. If it be assumed that an exception was saved to the action of the judge on the bill of particulars, the failure to act discloses no error.

3. The district attorney said in his closing argument to the jury, referring to the car described in the evidence as the "bandit car," meaning the car that came up and took away the murderer or murderers: "They find fault, gentlemen, with Levangie. They say that Levangie is wrong in saying that Vanzetti was driving that car. I agree with them, gentlemen. I would not be trying to do justice to these defendants if I pretended that personally so far as you are concerned about my personal belief on that, that Vanzetti drove that car over the crossing. I do not believe any such

thing.   You must be overwhelmed with the testimony that when the car started it was driven by a light haired man who showed every indication of being sickly . . . but he saw the face of Vanzetti in that car, and is his testimony to be rejected if it disagrees with everybody else if you are satisfied he honestly meant to tell the truth? . . . and I agree if it depends on the accuracy of the statement that Vanzetti was driving, then it isn't right, because I would have to reject personally the testimony of witnesses for the defence as well as for the Commonwealth who testified to the contrary.   I ask you to find as a matter of common sense he was, in the light of other witnesses, in the car, and if on the left side that he may well have been immediately behind the driver." Levangie, a gate tender at the railroad crossing in South Braintree over which the jury could find the car passed in its flight, testified that Vanzetti was then driving the car, and these admissions of the district attorney, that Vanzetti was not driving the car, bound the Commonwealth.   *Commonwealth* v. *Desmond,* 5 Gray, 80.   It does not follow from the admissions of the district attorney that it was improper for the jury to consider the testimony of Levangie in determining whether or not Vanzetti was in the car.

The defendants severally moved for a verdict of not guilty on all the evidence and, the motions having been denied, they severally excepted.   It is contended on behalf of Vanzetti that his being in the car at all could be found to be merely probable, and that his presence therein was not proved beyond reasonable doubt.   Although no witness identified Vanzetti as one of the persons who actually fired the fatal shots, or as being at the immediate scene of the homicide, there was evidence that he was in South Braintree on the morning of April 15, and was seen in a five or seven-passenger automobile in the public square of the town, and there was evidence also that this automobile was the car in which the murderers made their escape.   There also was some evidence that Vanzetti was in Brockton in an automobile corresponding in description with the automobile in question on the afternoon of April 15.   He was identified at the railroad grade crossing in Matfield later in the afternoon where the automobile was appreciably stopped because the gates were

down. The jury were warranted in finding from a plan introduced in evidence and from a view which included the alleged route taken by the bandit automobile, that the course taken included the localities to which reference has been made. Also there was evidence, the probative effect of which was for the jury, that Berardelli owned a .38-calibre Harrington and Richardson revolver which he had on his person Saturday night before the shooting, and that this revolver, after the shooting, was found fully loaded in the possession of Vanzetti after his arrest. It further could be found that on the evening of May 5, 1920, Vanzetti, in company with Sacco, one Orciani, and one Boda, was at the house of Mrs. Ruth Corinne Johnson, a witness for the Commonwealth, in West Bridgewater, where they had gone for an automobile belonging to Boda, which was in her husband's garage, apparently being repaired. Mrs. Johnson's suspicions having been aroused by their appearance, she went to a neighbor's house, referred to as the Bartlett house in the record, followed by Vanzetti and Sacco walking on the other side of the road, to call the police. Vanzetti and Sacco then boarded an electric car, in the vicinity, for Brockton, the conductor of which testified that he recognized Vanzetti as one of two men who had ridden on his car on an evening nearly at the same date as the murder and that they entered the car in the vicinity of the Manley Woods going toward Brockton; these woods were near Manley Street in West Bridgewater where, as the jury could say, the "bandit car" ultimately was found. It was in evidence that a gun with a long barrel protruded through the broken back window of the car when it passed up Pearl Street, and there were found on Vanzetti shotgun shells loaded with buckshot. It is true that Vanzetti, who lived in Plymouth, introduced evidence which tended to show that he was not at South Braintree on April 15, as well as in explanation of his having the revolver, where he obtained it, and his possession of the shotgun shells. Although no witness could give direct evidence of the fact to be proved as to Vanzetti, viewing the evidence in the light of common experience, it could be determined to be so related to the fact in question that, applying experience to cause

and effect, a satisfactory and positive conclusion is reached. *Commonwealth* v. *Webster,* 5 Cush. 295. *Belhaven & Stenton Peerage,* 1 App. Cas. 278. The defendant also introduced much evidence tending to explain alleged incriminating circumstances and to establish his innocence. But whether he could be found to have been present at the scene of the murder or in any way to have participated therein, was for the jury. *Commonwealth* v. *Knapp,* 9 Pick. 496. The motion was denied rightly.

4. The trial was held at a special criminal sitting of the court for which five hundred jurors were summoned. The list of veniremen was exhausted after seven jurors had been selected, and therefore it became necessary to summon more talesmen. Instead of issuing a new venire, the court acted under G. L. c. 234, § 27, which provides: "If, by challenge or otherwise, a sufficient number of jurors duly drawn and summoned cannot be obtained for the trial of a case, the court shall cause jurors to be returned from the bystanders or from the county at large, to complete the panel, if there are on the jury not less than seven of the jurors who were originally drawn and summoned as before provided. The jurors from the bystanders shall be returned by the sheriff or his deputy or by a disinterested person appointed therefor by the court, and shall be such as are qualified and liable to be drawn as jurors." The court directed the sheriff to cause two hundred talesmen to be returned to complete the panel, and the following morning the sheriff returned one hundred and seventy-five from the county at large. The defendants excepted to the order. The statute is intended to provide for an emergency which may arise at a trial and the order to which the defendants excepted followed the statute. It is not within G. L. c. 277, § 66, entitling a prisoner indicted for a crime punishable with death or imprisonment for life to demand and receive a list of jurors who have been returned to try his case. The issuing of a venire for further jurors under G. L. c. 234, §§ 12, 23, would have required a delay of at least seven days, and it may be conceded, as the defendants contend, that under *Commonwealth* v. *Phelps,* 209 Mass. 396, 415, the seven jurors, in the discretion of the court, could have been

allowed to separate if an intermission had been taken. The order was to be executed forthwith by the sheriff and there was no contention that the talesmen were not returned from the towns and city of the county at large. Whatever the lexical definition of "bystanders" may be, we are satisfied that under the circumstances presented on this record, "bystanders" may be held to mean qualified talesmen summoned by the sheriff from the county at large. The talesmen having been returned, the defendants were permitted to. call and examine the sheriff and his deputies who assisted him, as to the mode adopted in summoning them. After this examination, counsel for the defendant Sacco, upon being asked by the trial judge, "Now, what is your motion?" replied "Challenge for cause, your Honor, of the juror on the ground that . . . the summons of these two hundred jurors and the method that has just been proven as having been the method that was followed, that that method is not in compliance with the statute . . . chapter 234." At the trial the contentions of counsel for the defence were: that the extra jurors should have been summoned from bystanders and not taken from the jury list of the county at large; and that the sheriff had no right to use his own judgment in selecting names from the jury list. There was no contention that the names were not taken from the jury list; but had that objection been so made it would not have affected the whole panel and therefore is not a ground of challenge to the array. It does not appear that this objection was raised with reference to any particular person called to serve as a juror. *Commonwealth* v. *Walsh,* 124 Mass. 32. *Johnson* v. *State,* 30 Vroom, 271. No fraud or partiality in favor of the Commonwealth or material injury to defendants is shown. It was a question of fact to be passed upon by the trial judge whether or not only talesmen were selected who would be likely to favor the Commonwealth, and the judge's finding that they were impartially selected is final, no abuse of discretion appearing. *Commonwealth* v. *Walsh, supra. Johnson* v. *State, supra.* The cases of *Commonwealth* v. *Gee,* 6 Cush. 174, and *Sackett* v. *Ruder,* 152 Mass. 397, 401, cited by the defence, are not in conflict. The defendants excepted to the refusal of the trial

judge to permit them to examine each of the one hundred and seventy-five additional talesmen, as well as each of the five jurors selected to complete the panel, separately "as to his views preliminary to exercising the rights of peremptory challenge, and not as a substitute." It is provided by G. L. c. 234, § 28: "Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead." Alphabetical lists of the persons summoned by the sheriff had been given by the clerk to the district attorney and counsel for the defence. The first juror having been called, counsel for the defendant Sacco, in which counsel for Vanzetti joined, asked that the court interrogate each juror as to his occupation, name and address of employer. A list of questions was passed to the judge and a colloquy followed, resulting in the refusal of the judge to ask the following questions: "Is the juror an employer of labor? If the juror is an employer of labor, does he employ union help when union help is available? If the juror is an employee, is he a member of any union? Is the juror opposed to organized labor?" Examination of jurors beyond the inquiries provided for by statute is left to the discretion of the presiding judge, who stated that the questions he had put covered the further inquiry propounded by the defence, which also was denied, namely, "Have you ever talked with any person that claimed to be a witness or to have personal knowledge of any of the facts in connection with this alleged crime?" It does not appear that justice or the statute required him to go further, and the defendant's exceptions are groundless. *Commonwealth* v. *Poisson*, 157 Mass. 510, 512.

5. It is contended that the exceptions to certain rulings by the trial judge, made on evidence introduced by the Commonwealth, to show that the car in which the murderers

escaped and the car found in the Manley Woods previously
had been stolen from one Dr. Murphy, as well as on evidence
introduced for the purpose of showing the association of the
defendants with Orciani and Boda before and after the mur-
der, should be sustained. This contention is not sound.
The evidence was relevant. The Commonwealth could and
did offer evidence that the car found in the Manley Woods
was the Murphy car and that this car had been used by the
murderers. The judge expressly told the jury that the theft
of the car itself "has nothing to do with this case whatever."
The questions to Mrs. Johnson, concerning what took place
on the night of May 5, and her identification of Orciani; the
questions to Johnson, relating to his getting Boda's Overland
car, his description of Boda's residence and the appearance
of the floor of his shed on the night of April 19, 1920, and his
conversation with Boda on the night of May 5; the direct
examination of the Commonwealth's witness Ensher as to
the residence and associations of Boda prior to the crime,
including photographs of the Coacci house, barn and shed,
and Boda's automobile; the rebuttal testimony of the Com-
monwealth's witness, Hawley, tending to show that on April
1, 1920, he saw Vanzetti in a seven-passenger Buick car with
four other men in Brockton; the examination of Vanzetti and
Sacco by the policeman on May 5, 1920, which related to a
motorcycle which the jury could find was at the Johnson
house on that night; the question put on direct examination
to the Commonwealth's witness George T. Kelley, in refer-
ence to Orciani and the motorcycle which apparently he
owned and drove to the Johnson house; and the questions put
to Daniel T. Guerin, a witness called in rebuttal by the Com-
monwealth, concerning Orciani, were admissible. The jury
on all the evidence could find that the defendants, in company
with Boda and Orciani with a motorcycle, were at the John-
son house on May 5, 1920. The testimony of the chief of
police who questioned Vanzetti on the night of his arrest as to
whether he knew Coacci or had been to the Coacci house, to
which Vanzetti answered "No," was taken care of by the
judge who said to the jury "Is there any connection at all,
so far as Coacci's name is concerned? There is no connection

that I recall at the present time, and, unless there is, you will give it no consequence. It is simply a part of this conversation — meaning a part of the conversation between the chief of police and the defendant Vanzetti — and nothing further was said concerning Coacci. The record also shows that, after the instructions and before the jury retired, they were told that by agreement all the evidence obtained by them on the view of the Coacci barn or shed was to be entirely disregarded. But assuming the connection was not shown, a motion to strike out was necessary and no such motion was made. *Commonwealth* v. *Johnson*, 199 Mass. 55, 59.

The answer of Kelley in direct examination, that Sacco introduced him to Orciani and that the time was either the Monday or the Tuesday night before Sacco's arrest, and that on the night of the introduction he saw a motorcycle, and that Sacco, upon being asked why he wasn't wearing an overcoat as the evening was cool, answered "He did not intend to ride home with it, but he went to see his friend, who brought him home in the motorcycle," also was competent. The motorcycle with its side car was at Sacco's house. It could be found on the evidence of this witness that the motorcycle was there in the afternoon of May 5, and was the same motorcycle seen at the Johnson house in the evening by Mrs. Johnson. The general conduct of the defendants was admissible. It could not be introduced as a whole but only step by step. The instructions of the judge on this aspect of the evidence, to which no exceptions were taken, were as follows: "There seems to be no dispute about some matters as to what took place on the night of May 5, 1920, at the Johnson house. It is admitted that Sacco and Vanzetti, Orciani and Boda were at or near the Johnson house on that night at about 9:20 P.M.; that the two defendants were arrested on an electric car while returning from West Bridgewater to Brockton . . . . As to what actually took place at the Johnson house, in the electric car, and at the Brockton police station, the parties are at great variance. At the time Mrs. Johnson went over to the Bartlett house, a distance of about sixty feet from her house, did the defendants follow her? Did they remain outside for about ten minutes

while she was inside the Bartlett house, telephoning the West Bridgewater police? While Mrs. Johnson was in the house, did she see the light of a motorcycle flashing back and forth on one side and on the other? If she saw this, what was its purpose? Were there telephone wires connected with the Bartlett house that could be seen from the street? Were the defendants conscious of or suspicious of what Mrs. Johnson was doing in the Bartlett house? Did that consciousness have anything to do with their departure? The Commonwealth claims it did." The order in which evidence shall be introduced is in the discretion of the trial judge in the conduct of the trial, *Commonwealth* v. *Johnson*, 188 Mass. 382, and the jury were to pass on the question whether the general conduct of the defendants, in connection with other evidence introduced later, showed consciousness of guilt. *Attorney General* v. *Pelletier*, 240 Mass. 264, 314. The testimony of Hawley tending to show that within fourteen days prior to the murder he saw Vanzetti in a seven-passenger Buick car with four other men in Brockton, also was admissible in connection with evidence that the "bandit car" was the same kind of car as a Buick car. *Commonwealth* v. *Russ*, 232 Mass. 58, 71. The admission of the conversation of Johnson with Boda on the night of May 5 and the evidence of Hawley that Vanzetti was in the car at Brockton, admitted in rebuttal after the defendants had rested, is barren of error. It was for the jury to say whether the proximity of the defendants or either of them was such that either or both heard the conversation between Boda and Johnson, and the evidence of Hawley tended to contradict the evidence of Vanzetti who testified in his own behalf to the contrary.

6. The defendants excepted to that part of the testimony of Mr. and Mrs. Johnson which described the conduct of the defendants in the neighborhood of the Johnson house shortly before their arrest on the night of May 5, 1920, to which reference has heretofore been made. Already we have considered the admissibility of this evidence and further discussion is unnecessary.

7. The question put to Bostock in direct examination by the Commonwealth, "To the best of your knowledge, belief

or recollection, is the revolver that I now show you like in appearance to the one you saw in Berardelli's possession?" was objected to for form. The witness testified that the Saturday night before the shooting he had seen the revolver, which the jury could find belonged to Berardelli, in his possession, but that he did not know the make. It was a .38-calibre revolver and was nickel plated. There also was evidence subsequently introduced that this revolver was found on the person of Vanzetti. The question was admitted properly. *Commonwealth* v. *Moinehan*, 140 Mass. 463, 464.

8. The admission of the question in direct examination asked of the Commonwealth's witness Pelser, who saw the shooting, and referring to the defendant Sacco, who then was at the bar: "Have you got any question in your own mind but what he is the man?" was proper. The question was one of identification and, even though leading, was admissible in the discretion of the court. It called for the recollection of the witness, assisted, if at all, by his present observation of the defendant. "The identity of a third person always is a matter of inference and opinion, but it is an opinion which any one who remembers facts on which to base the inference may give." *Commonwealth* v. *Kennedy*, 170 Mass. 18, 24.

9. The Commonwealth called Mrs. Lola R. Andrews, on whose evidence the jury could find that she was at South Braintree April 15, 1920, and as she was going into the Slater and Morrill factory between eleven and twelve o'clock in the morning, she saw a car standing by the roadside of the factory and a man working at the front part of the car, and "there was another man there with him," and when she came out these men were still there, one of whom she identified as the defendant Sacco. She testified further that a Mrs. Campbell, about sixty-nine years old, who was at Stockton Springs in the State of Maine at the time of the trial, was with her. The question was then asked "What can you tell the jury in reference to her eyes or eyesight, if you know?" and subject to the exception of the defendants' counsel, she was permitted to answer that "On April 15, 1920, she had cataracts on the back of both eyes. She had had them for

some time, a long time before the fifteenth of April, 1920. She knows this from her own personal knowledge." The judge told the jury that her testimony should have no effect whatever so far as the defendant Vanzetti was concerned, but ruled that the evidence was admissible against the defendant Sacco on the ground that his counsel declined to disclaim any purpose to argue to the jury that if Mrs. Campbell was not present as a witness for the Commonwealth the fair inference would be that her evidence would be unfavorable to its contention. But, Mrs. Campbell having given testimony as a witness for the defence in which she gave her version of what she saw, which contradicted Mrs. Andrews, this evidence was harmless.

As to the further evidence of Mrs. Andrews, that "When I heard of the shooting I somehow associated the man I saw at the car": this line of inquiry was opened by the defendants' cross-examination concerning the cabinet of pictures which she had been shown by Mr. Moore, of counsel for the defence, who had an interview with her at her home. She also properly was allowed to describe her mental state or condition, as well as the cause of that condition when she answered his inquiries. *Commonwealth* v. *Trefethen*, 157 Mass. 180. *Commonwealth* v. *Dies*, 248 Mass. 482, 489. It is urged that the Commonwealth was not trying to show that the statements on which the witness previously had been cross-examined by defendants' counsel had not been made to him, but was assuming that the statements had been made as contained in a stenographic report, which defendants' counsel produced, and was trying to show that the witness had an excuse for not remembering them at the trial. It was legitimate inquiry whether she had become so perturbed as to cause her to make conflicting statements, if the jury found she had made such statements.

The question, "Did she [you] talk with this Italian two or three days before concerning the alleged shooting?" referring to her evidence that an Italian had called at her house, and the answer "I did talk with the Italian concerning this shooting, yes, sir," were relevant under the circumstances. *Commonwealth* v. *Retkovitz*, 222 Mass. 245, 250.

Previously Mrs. Andrews was cross-examined, and after counsel had stated "Just at the intermission . . . you had seen and examined that photograph (indicating), and we had marked it and put the two large X's. You recall?" to which she answered "Yes, sir," she was then asked, evidently referring to the photograph, "And that, you say, . . . represented the first one that Mr. Moore spoke to you about . . .?" and the witness answered "As to that one, yes." She further was asked "And prior to it you had said that the one marked 'X' was not the one?" To this the district attorney objected. The trial judge said, "You can ask her if she did so state." But counsel for the defendants declined and insisted on the question as framed. The judge, subject to exception, excluded it. The witness was being interrogated as to alleged conflicting statements and under the circumstances the judge is not shown to have gone beyond the just limits of his discretionary powers. *Jennings* v. *Rooney,* 183 Mass. 577, 579.

10. Michael Levangie, a gateman at the railroad crossing to whom reference has been made previously, a witness for the Commonwealth, testified in direct examination that when the alleged "bandit car" came by he saw the driver whom he identified as the defendant Vanzetti. On cross-examination he said that he could not remember telling Mr. McAnarney, of counsel for the defence, in substance, that the curtain prevented his seeing the man driving the car. On redirect examination he stated that he could not remember whether any one had talked with him about the case. Having testified that he did not remember talking with Mr. McAnarney, he was asked on recross-examination, "So that you stand, in the light of all your senses, today your position is that I never spoke to you there at the gate house, whether it is two, three, or four weeks ago?" There was no error of law in the exclusion of this question, for reasons previously stated.

11. Vanzetti lived in Plymouth, which had railroad connections with Boston, and among other way stations were Cohasset, East Weymouth and East Braintree. John W. Faulkner, a witness for the Commonwealth, testified on direct

examination that on the morning of April 15, 1920, he took, at Cohasset where he lived, a 9:20 or 9:23 train for Boston. As the train came in at East Weymouth a man on his right sitting in a cross seat asked him "if this was East Braintree." He said, "No." "The man opposite him said 'The man behind me wants to know if it is East Braintree'. . . . I told him . . . when we came to it I would let him know. When we come to it, I did tell him, 'This is East Braintree.' He got up and got out." The witness described to the jury the appearance of the man behind him. He further testified that on July 20, 1920, he saw this man in the jail at Plymouth, and at the trial identified him sitting in the "cage" as the defendant Vanzetti. The witness was subjected to a long, searching cross-examination in which he expressed doubt as to whether the man who made the inquiries on the train was Vanzetti. The question of his credibility was for the jury, in the face of conflicting statements. *Lindenbaum* v. *New York, New Haven & Hartford Railroad,* 197 Mass. 314. It was proper, in redirect examination, to interrogate the witness further as to his recollection of what took place on the train and his certainty as to whether Vanzetti was the man. The question put by the trial judge, "What effect, if any, did the South Braintree shooting have upon your mind?" meant no more than whether that event assisted or revived his recollection of that which he previously had narrated. It tended to exhaust the memory of the witness as shown by his answer, "Well, it had that much on my mind that I thought that was one of the crowd that came up in the train with me." "Q. When did you have that thought? A. Why, as soon as I read the paper. — Q. That was when? A. Why, I think, the next day." These questions were admissible.

12. There was no error in the exclusion of the question asked in cross-examination of Harry E. Dolbeare, a witness for the Commonwealth, "Well, doesn't that bring to your mind this was something before ten o'clock?" Dolbeare testified on direct examination that sometime between ten and twelve o'clock in the forenoon of April 15, 1920, he saw an automobile with a number of men in South Braintree

square go through Holbrook Avenue and turn into Washington Street, going in the direction of Brockton. There were two persons in the front and three behind, one of whom he identified as the defendant Vanzetti. But on cross-examination he said that the time was nearer ten than twelve o'clock. The assistant district attorney said in his opening that Dolbeare saw the car "sometime after ten o'clock, perhaps half-past ten." Shelly A. Neal, also a witness for the Commonwealth, testified that he saw the car just before 9:30 A.M., standing in front of the door of the Slater & Morrill factory, and the Commonwealth contended that between the time stated by Neal and the time when Dolbeare observed it, the car had gone to East Braintree, taken Vanzetti aboard and returned to South Braintree. It is forcibly argued that if the car was seen by Neal at 9:30 and by Dolbeare before ten o'clock, the time was insufficient for the car to go to East Braintree and back before the murder. The trial judge said, "You assume in your question that on which there is no testimony. On that ground I will exclude it, and allow you to put it in proper form, by asking, 'Does that bring to your mind anything that happened?'" But counsel, although not denying the statement of the court, insisted that the question was proper and, upon its exclusion, excepted. The judge did not rule that leading questions could not be asked on cross-examination, nor indicate to counsel that they were to be deprived of the advantage of cross-examination, which is a fundamental right. This ruling also was within the discretionary power of the court.

13. The exclusion of the question asked in cross-examination of the Commonwealth's witness William S. Tracy: "Mr. Tracy, you say that this man (indicating), one of these men, resembled one of the men you saw there?" meaning South Braintree, comes within the same general rule.

14. A witness for the Commonwealth, Carlos E. Goodridge, on direct examination testified that at the time of the shooting he was in a pool room near the railroad at South Braintree and heard shots. He went to the door and saw an automobile coming toward him. As he stepped to the

sidewalk a man in the automobile "poked a gun over towards him," and that it was a "dark-colored revolver, shining barrel on it"; that he took the car to be a Buick car; that the "car was all dusty, the curtains torn out in the back end, the window, and there was something sticking through it." He identified the man who "poked the gun" at him as Sacco. On cross-examination he was asked "Are you not a defendant in a criminal case in this court?" The answer was "No, sir." The question and answer were excluded subject to the defendant's exception. The examination was again reopened on a statement of defendant's counsel that he "had in his possession the files from the clerk's office in the case of Commonwealth *v.* Carlos E. Goodridge charged with larceny and explained to the court that the files in the case showed that the defendant, Goodridge, had pleaded guilty; that the case had been filed and the defendant given probation." Counsel urged the right to put the questions theretofore asked and further questions pertinent to the record. The judge adhered to the former ruling on the ground that such examination would be inadmissible because the case had been filed. The ruling was right. There had been no conviction and there was no evidence that the witness had been promised that if he would testify for the Commonwealth in the cases at bar the case against him for larceny would be filed, and that he would be placed on probation. G. L. c. 233, § 21. *Commonwealth* v. *Walsh,* 196 Mass. 369. *Attorney General* v. *Tufts,* 239 Mass. 458, 537.

15. A police officer, Michael J. Connolly, who arrested the defendants on the night of May 5, 1920, on the trolley car, and took the weapons and other articles from them, was shown on cross-examination to have been watching the prisoners at the police station whenever persons came there to identify them. He was asked, "Were you there when any one came in there and said anything indicating that they did not recognize these men?" The question was excluded rightly. Evidence of acts and words of those who came for the purpose of identifying the defendants does not derive its value from the credit to be given the witness, but rests in

part on the veracity of the observer. It was hearsay. *Commonwealth* v. *Ricker*, 131 Mass. 581. *Elmer* v. *Fessenden*, 151 Mass. 359. It is urged that the question was not asked to show that the defendants were not the men who committed the murder, but to show that the Commonwealth had not produced certain eyewitnesses who were prepared to testify that the defendants were not the men and is not, therefore, hearsay. There was nothing to show that the Commonwealth was suppressing evidence.

16. It was in evidence from the Commonwealth's witness Julia Kelliher, that on the afternoon of the murder an automobile passed her near the corner of West Elm Extension and Pearl Street in Brockton at high speed. As it went past she took the number. The following Sunday she talked with Lieutenant Guerin of the Brockton police and told him the number. "I know it was 83 on the end, and I knew there was a 9 and 7. I don't know which order they came in." Lieutenant Guerin, having been called by the Commonwealth, was permitted, subject to the exception of the defendants, to testify that Miss Kelliher gave him a number and that at the time the number was given the subject of the conversation was the automobile which she had previously seen. The witness, however, did not testify to the number Miss Kelliher gave him, and the judge said, "The purpose was to get in some number plates, or the numbers. They are not in, gentlemen, and you will give them no consideration whatsoever." Miss Kelliher also testified without objection that she remembered the number on the following Sunday and talked with Guerin and gave him the number which she remembered. It is plain that the defendants have no ground of complaint because of the admission of these questions. *Morrison* v. *Lawrence*, 186 Mass. 456, 458. *Chandler* v. *Prince*, 217 Mass. 451, 459.

17. The revolver taken from Vanzetti when he was arrested was put in evidence as Exhibit 27. The evidence of Lincoln Wadsworth, called by the Commonwealth, tended to show that as an employee of the Iver Johnson Sporting Goods Company he "had charge of the pistols and repairs to firearms," and that a "38 Harrington & Richardson revolver,

the property of Alex Berardelli, was brought in for repairs, and sent up to the shop on March 20, 1920." The question "Can you tell the jury whether or not the revolver which was brought in on that date is of the same type and calibre of revolver as the one I have now shown you [showing him Exhibit 27]?" to which the witness answered "Yes," was for the purpose of identifying the exhibit as being the same revolver which had been brought in by Berardelli for repairs; and the question, to which counsel for Vanzetti excepted: "  . . . Will you tell us whether or not that revolver which I have shown to you answers the description of the revolver brought in that day?" and the answer "It does," were admissible. *Commonwealth* v. *Kennedy*, 170 Mass. 18.

The evidence of George F. Fitzemeyer, also a witness for the Commonwealth, who was employed by the Iver Johnson Sporting Goods Company as "foreman of the gun shop," was admissible. Certain records, which this witness brought with him, were excluded as inadmissible. No error appears in granting the witness permission to refresh his recollection from reading the records, and the question "What, if any, distinctions are there between a 32 and 38 Harrington & Richardson revolvers?" was competent in the discretion of the judge, no question of his qualifications to give such evidence appearing. *Carroll* v. *Boston Elevated Railway*, 200 Mass. 527, 533.

18. The trial judge permitted James H. Jones, a firearms salesman for the Iver Johnson Sporting Goods Company, to give evidence on behalf of the Commonwealth, that the revolver left by Berardelli had been redelivered. He was asked, "Has your concern any established custom regarding the disposition of revolvers or guns which are not delivered or called for after repairs are made upon them?" The reply was, "Yes." "Q. If guns are not delivered within a certain time, what do you do with them? A. At stock taking time the first of the year, we take the revolvers from the repair drawer and put them in a desk in the office on the third floor, and they are held there for a while and then sold. . . . — Q. Was this gun ever sold? A. That gun was not sold from our store. . . . — Q. And any sales since March, 1920, other

than the one this year? A. No, not since March, 1920. . . .—
Q. Has there been any sale of uncalled for revolvers since
March, 1920? A. Yes, sir. — Q. And when was such sale?
A. In February, 1921." Then the witness was asked "And
was this revolver sold at that time?" and over the objection
of counsel for the defence was permitted to answer, "That
revolver was not sold at that time, — not — " Even if the
witness did make conflicting statements in this regard, the
jury could find that there was no sale of revolvers left for
repairs and not called for from March 1, 1920, to February 1,
1921, and that the revolver, Exhibit 27, was not sold in
February. This testimony, the weight of which was for the
jury, was relevant to the issue, whether the revolver found on
Vanzetti was the revolver of Berardelli. The established
course of business also, for this purpose, could be put in
evidence. *Nugent* v. *Boston Consolidated Gas Co.* 238 Mass.
221, 235, and cases there collected.

19. A cap was picked up near the body of Berardelli shortly
after the murder was committed. It was offered in evidence
by the Commonwealth on its contention that the cap had
been worn by the defendant Sacco on that day. It was
referred to in the record, in connection with evidence re-
lating to the admission of the cap, as Exhibit 29. The ad-
mission of the cap was subject to exception by the defendant.
We are of opinion that it was admitted rightly. George T.
Kelley, a witness for the Commonwealth, testified on direct
examination that he had known Sacco, who lived near the
witness, for ten or twelve years and had employed him in
his shoe factory at Stoughton for six or eight months prior
to April 15, 1920; that there were occasions when he wore a
cap; that he had seen Sacco wearing a dark cap of a salt and
pepper design and naturally dirty; that he could not describe
it otherwise than as a dark cap. The witness then was
shown Exhibit 29 and asked if that was "alike in appearance
to the cap that you have described as being worn by Sacco,"
to which question he replied, "The only thing I could say
about that cap . . . from hanging up on a nail in the dis-
tance, it was similar in color. As far as details are con-
cerned, I could not say it was." He further stated that the

only opportunity he had of observing the cap was when it was hanging on a nail in the factory. Replying to the question: "Mr. Kelley, according to your best judgment, is the cap I show you alike in appearance to the cap worn by Sacco?" he said "In color only." A colloquy then occurred between the presiding judge and the witness: THE JUDGE. "That is not responsive to the question. I wish you would answer it, if you can." THE WITNESS. "I can't answer it when I don't know right down in my heart that that is the cap." THE JUDGE. "I don't want you to. I want you should answer according to what is in your heart." THE WITNESS. "General appearance, that is all I can say. I never saw that cap so close in my life as I do now." THE JUDGE. "In its general appearance, is it the same?" THE WITNESS. "Yes, sir." THE JUDGE. Addressing the district attorney "You may put the question so it comes from counsel rather than from the court." The question then was asked by the district attorney, "In its general appearance, is it the same?  A. Yes."

We have not overlooked the fact that other caps were referred to at the trial: a cap taken from Sacco's house after his arrest; a cap identified by Sacco as a cap bought by him in March, 1920; and a new sample cap procured by counsel for the defence and referred to by Kelley, who later was called as a witness by the defence, as "the nearest thing I have seen to" the cap Sacco wore. But the identification of Exhibit 29 as the cap of Sacco, found under the circumstances already stated, was a question to which the attention of the witness was specifically directed and whatever he said at any stage of the case before and after his answer to the question as to "its general appearance" goes only to the weight to be given by the jury to his entire testimony. The position taken by the trial judge did not go beyond the legitimate bounds of inquiry. *Commonwealth* v. *Kennedy*, 170 Mass. 18. The question properly was left to the jury under instructions not excepted to: "Now, the Commonwealth claims that if this cap belonged to Sacco, it could not have been found near the dead body of Berardelli unless the defendant Sacco lost it there at the time of said shooting. If,

then, he lost it at that time, you have the right to say that he was then present. On the other hand, you should remember that the defendant Sacco and his wife both have testified that said cap never belonged to the defendant, and that he never owned it, and if that is true, it should not be considered by you as evidence against him."

20. In his closing argument to the jury, the district attorney said that Sacco had denied that the cap, Exhibit 43, taken from his house, and put in evidence, was his cap. "He has falsified to you before your very faces. When Exhibit 43, his own cap that Lieutenant Guerin says he got out of his own house, was produced and shown to him before Lieutenant Guerin testified, he would not admit, gentlemen, that his own cap was his. What is there about that cap, which admittedly was not picked up on the scene of the murder, that would drive him from truth? Do you believe Guerin? Do you think a man who has risen high enough in the police department in the city of Brockton, a great police department, do you think a lieutenant of that department would on his oath commit the perjurious utterance of saying that was Sacco's cap and that he took it out of his house and that it is in the same condition now as then, if that were a fabrication? And Sacco denied it. Why, gentlemen of the jury? It is too obvious to need argument. The reason he denied it was because this cap that was picked up by . . . ." At this point he was interrupted by defendants' counsel: "If your Honor please, I will ask either the retraction of the statement that the defendant denied that that was his hat, or a reading of the record. My recollection of the record is that the defendant stated in the first instance, that it was; in the second instance on pressing, that he wasn't sure because he thought his cap was a little lighter. Now, that is my recollection of the testimony. At no time did he say positively that it was not his hat. Neither would he say positively that it was *not*." * THE JUDGE. "That is my recollection of the testimony." MR. MOORE. "Take an exception." THE JUDGE. "But it is for you gentlemen to

---

*The word "not" which is italicized obviously is a typographical error and should have been omitted.

determine what the evidence was." The district attorney, resuming his argument, said: "I am grateful to Mr. Moore for interrupting — I trust that so important a case as a charge of murder against two human beings, that I would not permit myself to stray a thousandth part from the testimony as I recall it. I am not attempting to repeat to you what has taken six weeks to utter before you word for word. I am trying to sum up fairly a just summary of what they have said, and I call your attention and that of counsel for the defendant, who did me the kindness of interrupting me, · that when I finally left the defendant Sacco he said 'No, that cap is too dirty. I have got fifty cents to buy a new cap whenever I need one.' And I ask you, gentlemen, if it is not a fair inference from that statement, if I am now stating the evidence to you accurately, to say that Sacco denied that was his cap." The jury were to pass on evidence appearing in the record from which more than one inference of fact could be drawn, *Lindenbaum* v. *New York, New Haven & Hartford Railroad*, 197 Mass. 314, and the argument did not exceed the reasonable rights of the Commonwealth to comment on the credibility of the testimony of Sacco which was left to the determination of the jury. The case at bar does not come within *London* v. *Bay State Street Railway*, 231 Mass. 480, in which the statement of counsel for the plaintiff in his argument to the jury — that they were making the law for the county in which the case was being tried — was left uncorrected by the judge after his attention had been called to it by counsel for the defendant; nor does it come within *Commonwealth* v. *Cabot*, 241 Mass. 131, where the assistant district attorney repeatedly told the jury that one of the defendants had said that the defendants were going to raise a technical defence which apparently was intended to convince the jury that such a defence was unjustifiable, although the defendants had a legal right to make it. This exception is groundless.

21. Henry Cerro, called by the defendants, in direct examination described in detail one of the men he saw doing the shooting, and to the question, "Did you get a good view of the man that you did see shoot this man, that you have

described?" the witness answered "Some, yes." "Q. Did you see — did you get his front view, a view of his face? A. Yes." On motion of the district attorney, the answer was stricken out, the judge observing, "Put it the other way." Counsel declined and saved an exception. It is argued that the judge in fact ruled that the question was leading and therefore incompetent. But the reason for striking out the answer is not shown by the record. The defendants, however, were not prejudiced, for, the witness having fully described in previous testimony the facial appearance of this man, stated in subsequent testimony that he was facing him and that neither of the defendants was the man.

22. The question asked in redirect examination of Peter McCullum, a witness for the defence, "And you also told Mr. Moore in what part of the factory Pelzer worked, did you not?" was excluded and exception taken. The question was leading, therefore its admission was discretionary and clearly so at the stage of the trial when it was put. *McLean* v. *Paine*, 181 Mass. 287, 289. No abuse of discretion is shown.

23. The exception taken to the exclusion of the record made by defendants' witness Ella M. Urquhart, a nurse employed by the Plymouth Cordage Company, which related to a call from one Dr. Shurtleff to go on a case on April 15, 1920, cannot be sustained. Vanzetti, who was a resident of Plymouth, among other defences contended that he was at Plymouth at the time of the murder. In support of this contention Mrs. Alphonsine Brini testified that she lived in North Plymouth and had known Vanzetti for eight years; that on April 15, 1920, she saw Vanzetti with a peddler, Joseph Rosen, who also testified for the defendant, at her home between 11:30 and 12 o'clock that forenoon, and that Vanzetti showed her a piece of cloth which she examined. When asked how she was able to state the time, she answered "I remember because it was . . . my first week that I came home from the hospital," where she had been from March 18 to April 8. In answer to a question, whether she had any further reasons for fixing the date, the witness said "Yes

.... it has regard to my condition, and telephoning to the doctor the day before," her condition having become worse in the morning of April 14, and she called her husband, who worked for the company, to telephone for the lady doctor there who came to her house on the morning of the fifteenth. The witness Urquhart testified that while records were kept, no one was designated to keep them and that the record which she had with her for April 15 was in her own handwriting, although she was not the nurse who visited Mrs. Brini. The entries made by the witness were not made from her personal knowledge, but were made from information furnished by others. They would not have been admissible if offered by the Commonwealth against the defendants, and in principle they are not admissible in favor of the defendants. *Kaplan* v. *Gross*, 223 Mass. 152. *Commonwealth* v. *Perry*, 248 Mass. 19, 29.

24. The defendant Sacco was asked in direct examination "Mr. Sacco, in your conduct, was your conduct of May 5, what you were doing on the night of May the fifth, based upon information that you had received during the preceding week?" This question related to what had taken place at the Johnson house when Sacco was present. The district attorney objected. The judge suggested, "Prove everything that he did do. Then ask him, if you desire." MR. MOORE. "May I ask whether your Honor is now ruling that this question that is now pending is objectionable?" THE JUDGE. "At the present time it seems to me it is objectionable." MR. MOORE. "Then, . . . I ask leave to reserve an exception, and will then follow the court's suggestion." But, if we assume the question was proper, although this may be doubted as it seems leading, the information called for was elicited afterward in another form without objection in further examination of the defendant. Accordingly the error, if any, was cured. *Morrison* v. *Lawrence*, 186 Mass. 456, 458. *Garland* v. *Boston Elevated Railway*, 210 Mass. 458, 460.

25. The Commonwealth, as stated in substance at the argument in this court by the assistant district attorney, introduced evidence tending to prove that Sacco, with Van-

zetti, was in South Braintree on the morning of April 15, 1920, and at one time was near the entrance to the Hampton House; that he shot Berardelli; that he was in the automobile as it moved northerly across the railway tracks and through Pearl Street; that this automobile was later found in the Manley Woods in West Bridgewater; that it was in South Braintree that morning, part of the time in front of the Slater & Morrill, Incorporated, entrance to Hampton House; that when it passed through Pearl Street, the back window was broken, and a long barrelled gun protruded; that he was seen in this automobile on Pearl Street, and at Brockton, about 3:50 P.M.; that this was the automobile in which the murderers made their escape; that he was absent from his place of employment at the shoe factory on this day; that on May 5, 1920, he was seen, in company with Vanzetti, Orciani and Boda, at the house of Simon E. Johnson on North Elm Street, West Bridgewater, where he so acted that Mrs. Johnson called the police; that on the same evening, in company with Vanzetti, he boarded an electric car near the house to go to Brockton; and that while on the car he was recognized by the conductor as one of two men who got on the car at about the same point in the evening of a day near the day of the murder; that he was arrested by police officers in Brockton at the end of the trip; that he reached under his coat when in the police automobile on his way to headquarters, was stopped by an officer, and denied that he was armed; that at the police station there was found on his person a .32-calibre automatic pistol with a loaded clip of eight cartridges, and one cartridge in the barrel, and, in his right hip pocket, twenty-three cartridges of .32-calibre of various makes; that when questioned by the chief of police and the district attorney, he falsified as to his movements that evening as well as to other material inquiries; that the cap found near the body of Berardelli belonged to Sacco, and that near the body of Berardelli four shells also were found, each of .32-calibre, and of various makes, corresponding to those found in Sacco's pockets, one of which had been ejected from his pistol; that a bullet removed from the body of Berardelli, which had caused his death, was fired from the pistol found on Sacco. The de-

fendant Sacco introduced evidence which tended to prove
that he was in Boston on the day of the murder and had not
shot either of the decedents.   Also there was evidence given
by him in explanation of the alleged falsehoods and of his
presence at the Johnson house on the evening of May 5, and
of his being armed and owning a revolver; that the cap was
not his cap; that the mortal bullet, taken from the body of
Berardelli, was not fired from his pistol; nor were any of the
shells found near the body of Berardelli ejected from his pistol.
He also introduced much evidence impeaching the witnesses
for the Commonwealth, and in support of his denial of any
participation of the murders.   In his direct examination
comprising many pages of the printed record, Sacco testified
that he was born in Italy from whence he came to the United
States at the age of seventeen, arriving in 1908; that in June,
1917, a week before registration, he left his place of employ-
ment in Milford and remained out of the United States until
the following August or September; that when he left Mil-
ford he assumed the name of Nicola Moscatelli, the maiden
name of his mother "in order not to get in trouble in con-
nection with registration."   In November, 1917, he began
work at a shoe factory in Stoughton where he lived, which
employment continued at least until May 1, 1920.   He
became acquainted with Vanzetti, whom he had known
personally for three years, as well as with Orciani and Boda,
whom he had known respectively seven and three years.
The United States declared war with Germany April 6, 1917,
and he was more or less associated with those who were
opposed to the war as well as to the laws relating to the
selective draft.   It either was admitted, or the jury could
find that he was a radical and had been engaged in the recep-
tion and circulation of various papers, books, and other
printed matter denouncing the war and its effect upon the
economic and social welfare of the country.   The Federal
authorities had deported a number of men in this Common-
wealth as well as elsewhere who had been actively engaged in
the advocacy and dissemination of such views.   He testified
that, being in possession of a number of papers and books
which, if discovered, would tend to criminate him and lead

to his deportation, he had gone to the Johnson house where Boda's automobile was to be obtained and used to collect and carry away this accumulation of newspapers and books, as well as possibly some records of meetings of radicals in which Sacco had participated, and to place them where they could not be discovered. There was evidence given by him also, that statements he made when examined by the chief of police and the district attorney after his arrest were not true because he desired to protect himself from possible deportation.

The general subject of Sacco's loyalty to the United States and respect for its system of government and institutions having been more or less inquired about and developed in his examination in chief along the lines just stated, the district attorney, subject to the defendants' exception, was permitted to ask Sacco in cross-examination the following questions: "Is your love for this country measured by the amount of money you can earn here? . . . What is the reason you came back from Mexico if you did not love money then? . . . Don't you know Harvard University educates more boys of poor people free than any other university in the United States of America? . . . Don't you know that each year there are scores of them that Harvard educates free? . . . Did you intend to condemn Harvard College? . . . Were you ready to say none but the rich could go there without knowing about offering scholarships? . . . Do you know how many children the city of Boston is educating in the public schools free? . . . Do you know it is close to one hundred thousand children? . . . And do you subscribe to any papers? . . . Was the printing of that paper stopped during the war? . . . Was the printing of Le Mortelle stopped during the war? . . . Were they anarchistic papers? . . . Were any of the books that were in your house anarchistic? . . . Were you aware of his views — Fruzetti's views, with respect to anarchy? . . . Did you know what they were, yes or no? . . . Were you afraid of deportation yourself on May 5? . . . Did you find out from him what he thought, what his views were with respect to anarchy? . . . Were your views with respect

to anarchy substantially the same as Fruzetti's? . . . As far as you understood Fruzetti's views, were yours the same? . . . And you are a man who tells this jury that the United States of America is a disappointment to you? . . . Are you, Mr. Sacco? . . . Well, tell us about how disappointed you were, and what you did not find and what you expected to find. Are you that man? . . . Why did you tell me a falsehood that on Thursday, the day before you read the account in the paper, you worked all day?" "And in order to show your love for this United States of America when she was about to call upon you to become a soldier you go away to Mexico? Mr. Sacco, that is the extent of your love for this country, isn't it, measured in dollars and cents?" These questions as well as the questions relative to the effect on his wife of his possible arrest and deportation for participation in movements inimical to the government, were within the rule that a witness may be cross-examined in the discretion of the judge to test his accuracy, veracity or credibility, or to shake his credit by injuring his character, and for this purpose his way of life, his associations, his habits, his prejudices, his physical defects and infirmities, his mental idiosyncrasies, if they affect his capacity, his means of knowledge, powers of discernment, memory and description, may all be relevant. Steph. Ev. c. 16, art. 129. 1 Greenl. Ev. (16th ed.) § 446. Wigmore on Ev. (2d ed.) § 944. And the extended colloquy between the trial judge and counsel, more or less explanatory of this course of procedure, does not show as matter of law any abuse of the judge's discretion. *Commonwealth* v. *Savory,* 10 Cush. 535. *Commonwealth* v. *Curtis,* 97 Mass. 574, 579. *Commonwealth* v. *Clark,* 145 Mass. 251. *Jennings* v. *Rooney,* 183 Mass. 577.

The argument is pressed that the purpose of the district attorney's questions obviously was not the purpose declared by him and accepted by the trial judge, namely, to affect the credibility of Sacco, but was to excite and intensify prejudice against him. But we must follow the record, and a careful reading of it does not sustain this contention. Furthermore, the judge specifically instructed the jury: " . . . the radical as well as the conservative, the foreign-born as

well as the native-born, are entitled to and should receive in all trials under our laws the same rights, privileges and consideration as the logic of law, reason, sound judgment, justice and common sense demand. I therefore beseech you not to allow the fact that the defendants are Italians to influence or prejudice you in the least degree. They are entitled, under the law, to the same rights and considerations as though their ancestors came over in the Mayflower."

26. The defendant Sacco was absent from his work at the factory on April 15, 1920. It was the contention of the defence that he went to Boston to visit the Italian consulate to obtain information about passports for his intended return to Italy. Antonio Dentamore, a witness for the defendants, called, among others, to establish Sacco's presence in Boston at the time the murders were committed, testified that he resided in Boston and was the "foreign exchange man in the Haymarket National Bank"; that he was introduced to Sacco in a coffee house in Boston at about quarter of three in the afternoon of April 15, 1920, and had about twenty minutes' conversation with him in which passports and the consul's office were mentioned. Dentamore was asked "In what way are you enabled to tell this jury and court that you met Sacco on the fifteenth day of April? . . . A. I know that because that day I went to the banquet in honor of Editor Williams of the Boston Transcript . . . . An Italian decoration [was to be] given . . . to Mr. Williams for the attitude of his newspaper during the war, in favor of Italy." He further testified that "He had been to the banquet when he met Sacco. Up to that time Sacco was a stranger to him." A cross-examination having followed, he was asked in redirect examination: "Did you know Mucci, a member of the Italian Assembly? A. Yes. — Q. Where did you know Sacco came from in Italy?" THE JUDGE. "If it comes from his personal knowledge he may testify. If it is purely hearsay it is incompetent." The next question was, "Well, as a fact, in the introduction . . . between you and Sacco . . . was Sacco's birthplace mentioned?" The question was excluded. The witness then was asked "As a fact, did you learn . . . of Sacco's birthplace at that introduction?" This question

was rightly excluded. The witness then was asked "Who is · Mr. Mucci? A. Mr. Mucci is an Italian, — just an Italian congressman, how they say here, congressman, a member of the Chamber of Deputies." A further question followed: "As a matter of fact, in that conversation which you had with Sacco on April 15, was it developed, did it become known to you that you were, both of you, acquaintances and friends of Mr. Mucci during the period of his residence in Boston?" To the exclusion of this question the defendant excepted. An offer of proof then was made, "that in this conversation that was had between the witness and Mr. Sacco that it became known to the witness that Mr. Sacco and himself were both from the same section in Italy, that they were both mutual friends and acquaintances of Mr. Mucci, and that the witness, after learning that Sacco was returning to Italy at an early date, that Mr. Dentamore then asked Mr. Sacco to convey to Mr. Mucci his well wishes and the fact that they had met one another in Boston," which was held inadmissible. The competency of the offer is urged on the ground that it was admissible to induce belief in the reliability of Dentamore's recollection that he saw Sacco in Boston for the first time on April 15, 1920. But the point was, whether the witness had seen Sacco in Boston on that day as he had testified, and proof from him of this instance to show that this was their first meeting would permit Dentamore to corroborate his own testimony. *Neal* v. *Boston,* 160 Mass. 518, 522. "When a witness has testified directly to a fact from the experience of his own senses, the extent to which he shall be allowed to testify to circumstances corroborative of the truth of what he thus has sworn must rest in the discretion of the judge who tried the case." *Commonwealth* v. *Bishop,* 165 Mass. 148, 152.

27. There was evidence that Ricardo Orciani was acquainted and on friendly relations with the defendants and was at Sacco's house on May 4, and May 5 of 1920; that he went with the defendants and one Boda to the Johnson house to get Boda's automobile. Orciani had been under espionage as being in some way connected with the murders, and, although taken into custody on May 6, he was finally released.

It also appeared that Luigi Falzini bought in October, 1919, from Orciani, a revolver which he identified as the Harrington and Richardson revolver, Exhibit 27, and had it at his house where Vanzetti testified he obtained it. He also admitted on cross-examination that he told the district attorney that he had owned this revolver for a long time and had got it in Boston, which statement could be found by the jury not to be true; that Falzini sold to Vanzetti the revolver found on him at the time of his arrest; and that Orciani had been seen during the trial sitting in an automobile "outside the court house." Already we have referred to the question, whether the conduct of the defendants at the Johnson house could be found to have shown any consciousness of guilt, or whether they or either of them feared arrest and possible deportation for participation in efforts which might have tended to impede the Federal government in its prosecution of the war. It was, therefore, material to inquire whether the revolver found on Vanzetti was purchased by him, or whether it was the revolver of Berardelli. On this evidence and the reasonable inferences to be drawn therefrom, it was for the jury to determine whether the defendants knew, or could have ascertained, where Orciani was and summoned him as a witness, and whether, if so summoned, his evidence would have been favorable to them. The district attorney, in his closing argument, in alluding to the defendant Vanzetti, said: "'Why didn't you bring Orciani into this court room and why didn't you permit Orciani to testify, the man who could explain about this profound reason for the consciousness of guilt, if that reason existed in him? He has been within the control of this defence. He has been outside the court room, as witnesses have testified, and he is not produced. What is the reason? The Commonwealth has a right to draw the inference that if produced he would give testimony that is not helpful to these defendants. And I make that comment and I ask you to draw that inference that Ricardo Orciani was not produced because if produced his testimony would be against the interests of the defendants." Counsel having objected to this line of argument, the trial judge ruled, "I will allow it to stand," and the defendants

excepted. We discover no error. "The practice of permitting counsel to comment on the failure of the opposing party to call witnesses to facts needs to be used with caution, and such comment should be permitted only where it appears that the witnesses could have been produced, and that it is a fair inference from the conduct of the party, under all the circumstances, that he knew or believed that the testimony of the witnesses would be adverse, and for that reason did not produce them." *McKim* v. *Foley*, 170 Mass. 426, 428. "The mere fact that a witness is available to both parties does not necessarily preclude a jury from drawing an inference from the failure to produce him. If the state of the evidence," as in the cases at bar, "is such that the burden devolves upon one party of meeting a fact as to which the other party has made out a *prima facie* case, and the testimony of the absent witness would be material on that issue, and he is available to the party that reasonably would be expected to call him, then the determination of what, if any, inference should be drawn from his absence is for the jury." *Little* v. *Massachusetts Northeastern Street Railway*, 229 Mass. 244, 247.

The exceptions taken at the trial having been reviewed and considered, we come to the exceptions taken in the proceedings subsequent to the verdicts.

28. The substitute bill of exceptions of Vanzetti, relating to a hearing on First Supplementary Motion for a New Trial, recites that the case was tried for the Commonwealth by Frederick G. Katzmann, Esquire, then district attorney, and Harold P. Williams, Esquire, one of his duly appointed assistants. At the time of the first hearing on this motion, based upon the conduct of Walter H. Ripley, foreman of the jury, and also upon certain affidavits contained in a supplemental bill of exceptions previously filed, to which reference is hereby made, the term of office of Mr. Katzmann had expired, and Mr. Williams had been elected district attorney and had associated with him a first assistant district attorney, a second assistant district attorney and a deputy district attorney, all of whom were duly appointed. The court, however, subject to the defendants' exception and at the

request of Mr. Williams, appointed, on March 9, 1923, Mr. Katzmann as "special assistant district attorney in connection with these cases that we now have under consideration for this sitting," and "Thereafter Mr. Katzmann participated in the government's opposition to said motion." A continuance having been granted to March 16, he also acted for the Commonwealth on the question of the alleged temporary insanity of the defendant Sacco who, on March 17, was committed to a hospital for observation. It is further stated that on April 16, 17, 18 and 20, there were hearings on the question of the commitment of Sacco to the State Hospital at Bridgewater, to which he was committed on April 20, "against the opposition of his counsel." It is also stated that "Mr. Katzmann was present during a part of the hearings on these days but did not participate in the argument." Although Mr. Katzmann made a substantial argument in favor of the Commonwealth on the first supplementary motion at the hearing on October 2 and 3, 1923, he had been appointed, September 25, 1923, by the Attorney General "special assistant attorney general" and so continued during the further consideration of this · motion. G. L. c. 12, § 2. *Commonwealth* v. *Kozlowsky*, 238 Mass. 379. This appointment was. valid. The appointment, however, of Mr. Katzmann as special assistant district attorney was irregular, as there was in office an assistant district attorney for the Southeastern District who had been duly appointed. G. L. c. 12, §§ 13, 18. Nevertheless, it may be said that the court had power to allow Mr. Katzmann to aid the district attorney as pointed out in *Commonwealth* v. *Lane*, 254 Mass. 46, 49, and, a continuance having been granted, the defendant Vanzetti — whose bill of exceptions as to this instance is the only bill before us — was not prejudiced.

The supplementary bill of exceptions allowed May 9, 1925, which rests on the denial, respectively, of the motions designated as the "First Supplementary Motion and a Supplementary Motion hereto ( . . . Ripley Motion) and the Fifth Supplementary Motion and a Supplementary Motion thereto ( . . . Proctor-Hamilton Motions) and upon the decisions, findings, rulings and refusals to rule of the court upon those

several motions for new trial," and the defendants' bill of
exceptions to decision on second supplementary motion for
a new trial (Gould Motion) now are to be considered.

29. The First Supplementary Motion was filed No-
vember 8, 1921, on behalf of each defendant, and is founded
upon "facts, matters and things set forth in the affidavit of
Jeremiah J. McAnarney," of counsel for Vanzetti, which,
with other affidavits attached thereto, is referred to in the
argument as the "Ripley Motion."

Walter H. Ripley, foreman of the jury, died October 10, ·
1921. The affidavit of Mr. McAnarney states that in con-
versations with him shortly after the conclusion of the trial,
Ripley said that for twenty years he possessed a Harrington
and Richardson revolver of .38-calibre; that on the day he
was summoned as a juror, he expected to attend a firemen's
muster and to act as starter; that he took from his revolver
three loaded shells and put them in his vest pocket, replacing
them with three blank cartridges. The loaded shells he kept
in his pocket during the trial, but did not remember this
fact until Vanzetti's revolver with the five .38-calibre shells
had been put in evidence, and on October 7, 1921, he showed
the cartridges to Mr. McAnarney, who observed markings
on the percussion caps of each of them: two marked with
a straight scratch and the other with a cross. Ripley de-
clined to state how and when these marks were made, and
then gave one of the cartridges to the affiant; that Ripley
also said that when he placed these cartridges side by side
with the shells introduced by the Commonwealth (Vanzetti's)
it seemed to him that his shells were a trifle larger than the
Vanzetti shells, and there was some discussion between him
and the other jurors about these cartridges he had with him,
but refused to state who the jurors were or what was said.
The affidavit also contained the statement that after his
death, Mrs. Ripley gave to Mr. McAnarney two other loaded
shells which she found in the pocket of her husband's waist-
coat worn by him while sitting as a juror. It is unnecessary
to review in detail the affidavit of Mrs. Ripley, which was in
accord with her statements to Mr. McAnarney. Other
affidavits offered by the defence and by the Commonwealth

may be summarized as stated in the brief of the learned counsel for the defence, that " . . . five jurors . . . knew of Ripley's having the cartridges in his possession during the trial; that one of them (McNamara)" whose affidavit was not verified "knew that the cartridges 'were discussed by various members of the jury prior to the return of a verdict herein'; that five . . . knew nothing about the cartridges; and that one . . . did not see the cartridges or hear them discussed during the final deliberation," in the jury room. The defendants also introduced on this motion the original and supplementary affidavits of a qualified expert who, among other things, said that he "examined the entire trial record . . . in so far as the same bears upon the history and introduction of the said so called Vanzetti cartridges, Exhibit 32, and has examined said four ink marks and is of the opinion that said ink marks and each of them were placed upon said bullets after the said cartridges went into the juryroom before their return by the jury to the sheriff." It could be inferred from this portion of the affidavit that during the jurors' deliberations the Vanzetti cartridges had been marked with ink to distinguish them from the Ripley cartridges. Counter affidavits of a qualified expert for the Commonwealth were, in substance, "that in all the Vanzetti and Ripley bullets there are scores, bruises, cuts and scratches such as are very common indeed to the exposed portions of lead bullets. Such mutilations occur in manufacture and are present to some extent on cartridges even while being freshly packed at the factory. The further handling of cartridges incident to shipping and storage in the warehouse and sporting goods stores, as well as the tumbling in usage which they are subjected to by the customer, is an experience which it is well known and understood causes any amount of bruising, cutting and scratching as mentioned as being present in the cartridges referred to in this case." The other expert was of opinion "that it would be impossible by any test known to chemical science or to an ink stain expert to determine the time when said ink marks were placed on said cartridges at a date later than thirty days after said marks were originally made until the expiration of seven or eight years from the

time when said marks were first placed upon said bullets, . . . that the age of said ink marks could have been determined by appropriate technical and scientific tests if made within thirty days of the time said marks were made." The question: whether evidence of conversations between jurors, or statements made in the affidavit of Mr. McAnarney as to what was said to him by the deceased juror, or statements contained in the affidavits of jurors in support of or against the verdicts to prove what action or votes were taken in the jury room by any of them as a result of any such discussion, was illegal, improper, and injurious in effect, apparently was not raised at the hearings on the motion and therefore need not be considered. See *Cook* v. *Castner*, 9 Cush. 266, 278; *Woodward* v. *Leavitt*, 107 Mass. 453, 463; *Commonwealth* v. *White*, 147 Mass. 76, 79, 80; *S. C.* 148 Mass. 429; *Hall* v. *Reinherz*, 192 Mass. 52, 53. *Commonwealth* v. *Capland*, 254 Mass. 556, 559, 560. G. L. c. 233, § 65.

The judge states his reasons for deciding the question on the merits: "But it is not my purpose to decide this motion on any stringent law of public policy. It would be fairer to the Commonwealth, to the defendants, and to the jurors who are charged with misconduct, to decide the motion on its true merit." The record shows that at a preliminary hearing on the Ripley motion and before any affidavits had been filed by the Commonwealth, the district attorney said, "The government does not object to the affidavit of Amanda S. Ripley, or Wallace Hersey, who said that he saw shells loaded with powder and bullet in the possession of Mr. Ripley during the time he served as juror. It does not object to the affidavit of Seaward Parker, though his affidavit is merely hearsay, in that he says that he was informed by other jurors that Mr. Ripley had said shells. The government, if your Honor please, does not controvert the claim that Mr. Ripley at some time while he served as a juror had in his vest pocket two or more cartridges of .38-calibre Smith & Wesson; . . . The government does not dispute that at the time when this gentleman, the decedent, Mr. Ripley, came here, he had these three bullets in his pocket. I presume that is true. They doubtless remained in his possession

during the course of the trial. I expressly stated that I did not object to Mr. Hersey's affidavit, which says that he saw the bullets in the possession of Mr. Ripley during the course of the trial. It seems to me that summonsing the witnesses in to testify orally would simply furnish your Honor with merely cumulative testimony on an issue where there is really no issue, because the government does not claim for a moment that he did not have those bullets in his possession: . . . in this case where we raise no issue over that fact that Mr. Ripley did have two or more bullets in his vest pocket, and perhaps one more juryman saw them at some stage of the trial proceedings." In the thirteenth request the defendants asked the court to rule that "the admissions of the district attorney as to propositions of fact alleged in support of the supplementary motions of the defendants for a new trial, are binding upon the court as well as upon the government itself, in the sense that facts thus admitted must be accepted as facts. *Commonwealth* v. *Desmond*, 5 Gray, 80." The judge refused the request "on the ground that the district attorney, for the purposes of these supplementary motions for a new trial, made no admissions of fact that I find are binding upon the Commonwealth." The question for decision on all the evidence, notwithstanding the admissions, was, whether the defendants, on whom the burden of proof rested, had established the alleged fact that there had been such misconduct of the jurors or some of them as to impeach their verdict. The ruling of the court shows no error. *Commonwealth* v. *Jordan*, 207 Mass. 259, 275. It also may be said that the judge had the right to interpret this request as meaning not only that certain statements were to be taken as admitted by the Commonwealth, but also that the court could not decide the question on other material evidence. *Chubbuck* v. *Hayward*, 217 Mass. 134.

The eighteenth request that "On such facts as the court must accept as established on these motions, both defendants are entitled to a new trial as matter of right," could not have been given. The judge, after a long and exhaustive review of the evidence with preliminary findings, found that "the mere production of the Ripley cartridges and the talk or dis-

cussion about them did not create such disturbing or prejudicial influence that might in any way affect the verdict or operate in any way whatsoever to the prejudice of the defendants, or either of them." As before stated, it was for the judge on all the evidence to find the facts; and the credibility of the affiants and the weight to be given to their statements was for him. He could accept in whole or in part, or reject in whole or in part, and the question of a new trial was a matter of discretion. *Commonwealth* v. *Crapo*, 212 Mass. 209, 210.

Exclusive of the sixteenth, the other requests, which need not be enumerated, rested either on partial aspects of the evidence, or became irrelevant under the facts as found by the judge whose findings, being not unwarranted, were final. *Harrington* v. *Worcester, Leicester & Spencer Street Railway*, 157 Mass. 579, 581. *Davis* v. *Boston Elevated Railway*, 235 Mass. 482, 496, 497. *Quinn* v. *Standard Oil Co. of New York*, 249 Mass. 194, 204.

The sixteenth request was: "It must be regarded as a proved fact on these motions that Ripley's act in taking the cartridges into the jury room and in using them for whatever purpose he did use them while serving as a juror, was unknown to the defendants and their counsel until after the trial, and that they then exercised due diligence in bringing the facts to the attention of the court." The court found "that defendants and their counsel had no knowledge of the possession of said three cartridges by said Ripley, and that they exercised due diligence in bringing the fact of such possession to the attention of the court. . . . I also find that the rest of said request is not based upon established facts." It is argued that his refusal to give the request as framed was error. We repeat that it was for the judge to find on all the evidence and not a part of it, what the actual facts were, and this finding disposes of the refusal to give the request as framed.

The defendants also took seven exceptions to the decision on findings on the Ripley motion. But only errors of law are before us. The judge did not rule that hearsay evidence was not admissible on affidavits where no better evidence

could be obtained. It was considered, and the judge was to determine what weight should be given to it. *Soebel* v. *Boston Elevated Railway,* 197 Mass. 46, 52. Nor is it apparent that he exercised his judicial discretion in such a manner as to constitute a denial of justice. *Davis* v. *Boston Elevated Railway, supra.*

30. The defendants filed in support of the Ripley motion an undisputed affidavit of William H. Daly that during the week prior to May 31, 1921, Ripley said to him: "I will be leaving you for a couple of weeks," and that he "was going to Dedham to serve on the jury." The affiant asked him "if he was going to be a juror in the case of the two 'ginneys' charged with murder at South Braintree." The reply was "Damn them, they ought to hang them anyway." The defendant excepted "To the omission of the court to make any findings of fact, or ruling, or reference to, the affidavit of William G. Daley filed in support of said motion, or to the matter set forth in said affidavit." The defendants argue that "If this exception is sustained, an order for a rehearing of the entire Ripley motion must follow." Although there is no specific request or decision relating to the Daly affidavit which was filed in support of that motion, the denial of the Ripley motion carried with it the denial of the supplement thereto. We cannot doubt that this was the judge's understanding and also that it was so understood by counsel. This view is substantiated by the judge's order of November 6, 1924, extending, at their request, the time for filing claim of exceptions namely: "Memorandum and decision denying first supplementary (Ripley) motion for new trial and supplementary motion thereto supported by Daley affidavit." Even though the Daly affidavit was undisputed, the judge was not bound to believe him, nor was he required to give the reasons for his action. *Commonwealth* v. *Crapo,* 212 Mass. 209. Furthermore, before being sworn as a juror, it must be assumed that Ripley had answered in the negative the statutory questions put by the judge in his preliminary examination, whether he had expressed or formed an opinion, or was sensible of any bias or prejudice. We have not been unmindful in reaching our conclusion on the Ripley motion

that no evidence affecting the guilt or innocence of the defendants in any form not introduced at the trial could be considered to the prejudice of the defendants by the jury in their deliberations. But on the judge's findings, which have been sufficiently reviewed, there was no abuse of judicial discretion and, the proceedings having been in conformity with our settled practice in criminal cases on motions for new trials, there was no violation of the Constitution of the Commonwealth, Part I, art. 12, nor of the Fourteenth Amendment to the Constitution of the United States. *Chase* v. *Proprietors of Revere House,* 232 Mass. 88. *Twining* v. *New Jersey,* 211 U. S. 78, 100.

31. The fifth supplementary motion for a new trial was filed by Vanzetti in April, 1923; and on November 5, 1923, a supplement to this motion was filed in behalf of each defendant which was supported by affidavits. The defendants alleged exceptions to the overruling of the fifth supplementary motion, to the refusal of certain requests, and to certain statements in a paper filed. by the court entitled "Decision and Finding of Facts on Fifth Supplementary Motion." The record states these motions are based upon the discovery of new evidence relating to three important issues raised at the trial: (1) whether the Vanzetti revolver and cartridges had belonged to Berardelli; (2) whether any of the Fraher shells found at the scene of the shooting were discharged in Sacco's Colt automatic pistol; and (3) whether the mortal bullet found in Berardelli's body passed through the barrel of Sacco's pistol. The granting of a new trial on the ground of newly discovered evidence, as has been said repeatedly, rests on sound judicial discretion. *Commonwealth* v. *Green,* 17 Mass. 514, 535. *Commonwealth* v. *Borasky,* 214 Mass. 313, 322. *Commonwealth* v. *Dascalakis,* 246 Mass. 12, 24. We do not perceive anything tending to show that the judge's discretion was exercised improperly in the denial of this motion. The photographic and microscopic examinations and experimental tests set forth in the affidavits of the defendants' experts, which include, among other things, a minute description of Sacco's pistol and the alleged new hammer in the Vanzetti revolver which

were exhibits at the trial, were evidence only for the judge's consideration. Even if they were not opposed by counter affidavits, the judge had heard the evidence at the trial, and his declination to follow the defendants' experts cannot be classed as error of law. There was no error in the refusal of the requests. There is nothing in the exceptions to the findings or statements in his very full decision. The reasoning on the evidentiary value of the affidavits and other references to the history of the case were not rulings of law which were subject to exception. *Davis* v. *Boston Elevated Railway, supra.*

32. It is stated in the supplementary bill of exceptions that reference may be made to the bill of exceptions taken at the trial to the jury, and that bill, together with the parts referred to in the supplemental bill, "contain all the facts, evidence and other proceedings material to the defendants' said exceptions." At the time of his arrest, there were found in the possession of Sacco "a .32 Colt automatic pistol" and "twenty-three .32-calibre automatic cartridges" of various makes. "The pistol was fully loaded; eight cartridges in the clip and one in the barrel." A bullet of .32-calibre, introduced in evidence and marked Exhibit 18, was taken from Berardelli's body which, in the opinion of the Commonwealth's medical expert, had caused his death. The Commonwealth called William H. Proctor and Charles J. Van Amburgh, who qualified as experts on the construction as well as the practical use of firearms, bullets, and different styles of cartridges. Proctor, the first witness, in direct examination, using the exhibits as illustrations, explained to the jury how the "lands" and "grooves" of various kinds of pistols affected the bullet, and gave his reasons why the bullet, Exhibit 18, was discharged from a Colt automatic pistol and why other bullets, which also were in evidence, found in the bodies of Parmenter and Berardelli, were in his opinion fired from a Savage pistol. The following questions then were asked by the Commonwealth: "Have you an opinion as to whether bullet . . . [Exhibit 18] was fired from the Colt automatic, which is in evidence? A. I have. — Q. And what is your opinion? A. My opinion is that

it is consistent with being fired from that pistol. — Q. Is there anything different in the appearance of the other five bullets to which I have just referred, which would indicate to you that they were fired from more than one weapon? A. There is not. — Q. Are the appearance of those bullets consistent with being fired with the same weapon? A. As far as I can see. — Q. Captain, did you understand my question when I asked you if you had an opinion as to whether the five bullets which you say were fired from an automatic type of pistol were fired from the same gun? A. I would not say positively. — Q. Well, have you an opinion? A. I have. — Q. Well, that is that I asked you before. I thought possibly you didn't understand. What is your opinion as to the gun from which those four [five] were fired? A. My opinion is all five were fired from the same pistol." It is conceded by defendants' counsel that the word "four" in the foregoing question is an obvious misprint and should be read "five." To these questions and answers no exceptions were taken and the witness was subjected to cross-examination. But after the verdicts he gave an affidavit which is attached to the fifth supplementary motion for a new trial, referred to by defendants' counsel as "the so-called Proctor motion," in which, after recounting his experience and the fact that the pistols, cartridges and shells were in his custody for a considerable time, he continued as follows: "During the preparation for the trial, my attention was repeatedly called by the district attorney and his assistants to the question: whether I could find any evidence which would justify the opinion that the particular bullet taken from the body of Berardelli, which came from a Colt automatic pistol, came from the particular Colt automatic pistol taken from Sacco. I used every means available to me for forming an opinion on this subject. I conducted, with Captain Van Amburg, certain tests at Lowell, about which I testified, consisting in firing certain cartridges through Sacco's pistol. At no time was I able to find any evidence whatever which tended to convince me that the particular model bullet found in Berardelli's body, which came from a Colt automatic pistol, which I think was numbered 3 and had some other ex-.

hibit number, came from Sacco's pistol and I so informed the
district attorney and his assistant before the trial. This
bullet was what is commonly called a full metalpatch bullet
and although I repeatedly talked over with Captain Van
Amburg the scratch or scratches which he claimed tended to
identify this bullet as one that must have gone through
Sacco's pistol, his statements concerning the identifying
marks seemed to me entirely unconvincing. At the trial,
the district attorney did not ask me whether I had found any
evidence that the so called mortal bullet which I have re-
ferred to as number 3 passed through Sacco's pistol, ñor was
I asked that question on cross-examination. The district
attorney desired to ask me that question, but I had repeatedly
told him that if he did I should be obliged to answer in the
negative; consequently, he put to me this question: 'Q.
Have you an opinion as to whether bullet number 3 was
fired from the Colt automatic which is in evidence?' To
which I answered, 'I have.' He then proceeded, 'Q. And
what is your opinion?' 'A. My opinion is that it is consistent
with being fired by that pistol.'" After stating that he is
still of the same opinion he goes on: ". . . but I do not in-
tend by that answer to imply that I had found any evidence
that the so called mortal bullet had passed through this
particular Colt automatic pistol and the district attorney
well knew that I did not so intend and framed his question
accordingly. Had I been asked the direct question: whether
I had found any affirmative evidence whatever that this
so called mortal bullet had passed through this particular
Sacco's pistol, I should have answered then, as I do now
without hesitation, in the negative."

The mortal bullet which Dr. Magrath, the medical ex-
aminer, called as a witness by the Commonwealth, said he
took from the body of Berardelli was marked by him "III."
There were two affidavits, on behalf of the Commonwealth,
one filed by Mr. Katzmann and the other by Mr. Williams.
Mr. Katzmann states that prior to his testifying, Captain
Proctor "told me that he was prepared to testify that the
mortal bullet was consistent with having been fired from the
Sacco pistol; that I did not repeatedly ask him whether he

had found any evidence that the mortal bullet had passed through the Sacco pistol, nor did he repeatedly tell me that if I did ask him that question he would be obliged to reply in the negative." Mr. Williams in his affidavit stated: "I asked him if he could tell in what pistol this so called mortal bullet was fired and he said that he could not although the marks upon it were consistent with its having been fired in the Sacco pistol. He said that all he could do was to determine the width of the landmarks upon the bullet. His attention was not repeatedly called to the question, whether he could find any evidence which would justify the opinion that this bullet came from the Sacco pistol. I conducted the direct examination of Captain Proctor at the trial and asked him the question quoted in his affidavit, 'Have you an opinion as to whether bullet number 3 was fired from the Colt automatic which is in evidence?' This question was suggested by Captain Proctor himself as best calculated to give him an opportunity to tell what opinion he had respecting the mortal bullet and its connection with the Sacco pistol. His answer in court was the same answer he had given me personally before."

The portion of the judge's charge, quoted in the defendants' brief, reads as follows: "Now, the Commonwealth claims that there are several distinct pieces of testimony that must be considered upon the question of personal identification. Let us see what they are. First, that the fatal Winchester bullet, marked Exhibit 3, which killed Berardelli, was fired through the barrel of the Colt automatic pistol found upon the defendant Sacco at the time of his arrest. If that is true, that is evidence tending to corroborate the testimony of the witnesses of the Commonwealth that the defendant Sacco was at South Braintree on the fifteenth day of April, 1920, and it was his pistol that fired the bullet that caused the death of Berardelli. To this effect the Commonwealth introduced the testimony of two witnesses, Messrs. Proctor and Van Amburgh. And on the other hand, the defendants offered testimony of two experts, Messrs. Burns and Fitzgerald, to the effect that the Sacco pistol did not fire the bullet that caused the death of Berardelli." In his

memorandum of decision, filed December 24, 1921, prior to the making of the Proctor affidavit, denying the motion of each defendant for a new trial on the ground that the verdict was against the evidence, the weight of the evidence, and the law, which were the first two motions, to the denial of which no exceptions were taken, the judge said: " . . . there is no dispute but that marks in the barrels of pistols leave their identifying marks upon the bullets fired through them" and then added "To determine this question correctly between the experts on both sides, it would depend upon what identifying marks the jurors saw when making the comparison between the different bullets." The defendants do not controvert the unbroken practice, both under the statute and at common law respecting motions for new trials, not to examine the original trial for the detection of errors which might have been raised by exceptions taken at the trial; or that the judge when instructing the jury may state his recollection of evidence. *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 24. *Commonwealth* v. *Walsh*, 196 Mass. 369, 370. They charge that a successful attempt was made to mislead the court, the jury, and the defendants' counsel by the deliberate suppression of material evidence which, if introduced, would have been favorable to them. It was the duty of the district attorney to select able and unprejudiced experts who would testify without partiality or bias against the defendants, *Attorney General, petitioner*, 104 Mass. 537, 544. And if through the purposed conduct of the representatives of the Commonwealth prejudice was deliberately created, the question would be presented, whether justice had been done and if not done whether a new trial, at least as to the defendant Sacco, should be ordered. The question, therefore, before the judge on all the affidavits was one of fact. As we have said: he presided at the trial, instructed the jury and had the affidavits before him. It would have been sufficient if, having so determined, he denied the motion and nothing more. But instead he deemed it his duty to file a decision which is made by the appendix to the bill a part of it. This mode of procedure however, did not change the rule that the question of granting a new trial even in a capital case, or-

dinarily rests on the sound discretion of the court. The credibility of the affiant Proctor, even if his affidavit is read in connection with the affidavits of Hamilton and Gill filed by the defendants, was for the judge, who, among other things, expressly found that neither the district attorney nor his assistant intentionally solicited an ambiguous answer to the questions under consideration for the purpose of obtaining a conviction. The burden was on the defendants to establish wilful misconduct of the prosecuting officers by a fair preponderance of the evidence and the conclusion of the judge that this burden had not been sustained cannot as matter of law be set aside by us. The defendants' exceptions to the refusal to give requests numbered 19 to 23 inclusive are not well taken. Their exceptions to the overruling of the motion are untenable. The judge's analysis of the evidence and his comments thereon, contained no positive rulings of law, and the following conclusion: "Therefore, exercising every authority vested in me by law that relates to the granting of motions for new trials, I decline to grant this motion for a new trial on the Proctor affidavit, and the same is herein and hereby denied," cannot be successfully challenged. *Commonwealth* v. *Russ*, 232 Mass. 58, 83.

33. The last question presented is raised by the fourth bill of exceptions, entitled: "Exceptions to decision on Second Supplementary Motion for a New Trial," or the so called Gould Motion. At the trial there was conflict of testimony as to whether either or both defendants were "occupants of the automobile or in said group of men," the sole question being, whether the two defendants were in fact two of the men who were engaged in the crime. After the verdict, an affidavit of Roy E. Gould, and other affidavits in support thereof, were filed on behalf of each defendant. At the same time each defendant filed a motion for a new trial based upon said affidavits. Only one counter affidavit was filed by the Commonwealth. Also there was a motion based in part upon "an alleged inconsistency between the testimony given at the trial by another government witness, named Louis Pelser, and the answers to certain interrogatories signed by him and propounded to him by one of defendants' counsel

before the trial" and prior to his affidavit subsequently filed by the defendants; and in part upon certain counter affidavits filed by the Commonwealth. The court, however, in deciding the motion, filed two separate papers, one entitled "Decision on Second Supplementary Motion for New Trial (Gould Affidavit)," and the other "Decision on Second Supplementary Motion for New Trial (Pelzer Affidavit)," and dealt with said motion as the equivalent of two separate motions. Portions of the motion and affidavits dealing with Pelser and the paper entitled "Decision on Second Supplementary Motion for New Trial (Pelzer Affidavit)" are omitted from the present exceptions as immaterial. "At the hearing of said motions the facts stated in the affidavit of John J. Heaney were not denied by the government, nor was it denied at the hearing that the name and address of said Gould had been brought to the attention of the government by said Heaney before the trial and shortly after it had been obtained by said Heaney as appears in the affidavits; or that it was not disclosed to the defendants or either of them, or to their counsel, before the trial; or that no effort was made by the government to produce said Gould as a witness at the trial; or that the defendants had used due diligence in searching for said Gould both before and after the trial, and in obtaining and filing his affidavit and said other affidavits relating to him, and in bringing the same to the attention of the court." The scope and effect of this motion is nothing more than a motion for a new trial on newly discovered evidence, the granting of which was purely discretionary, as heretofore stated, and the exceptions taken to the denial of the motion as an abuse of judicial discretion, and to the entire paper entitled "Decision on Second Supplementary Motion for New Trial (Gould Affidavit)" as being "unauthorized by law, argumentative, fallacious, legally unsound, in large part irrelevant, and unfair" and to "the omission of the judge to make any proper findings of fact or to reach any conclusions of fact on the essential questions of fact involved in said motion" and to the "following passage in said paper entitled 'Decision' to wit: 'The affiant never saw Sacco, according to his affidavit, from

April 15, 1920, the day of the murder, until November 10, 1921, when he went to Dedham jail at the request of Mr. Moore,' as being a statement of fact unwarranted by the affidavits and in direct conflict with all the evidence in the case"; and to the "sentence immediately following the sentence above excepted to on the same grounds"; and to the sentence beginning with the words "For these verdicts did not rest, in my judgment, upon the testimony of the eye witnesses"; and to the two sentences following the same, "as containing an unwarranted assumption of fact, and indicating that the reasoning by which the Judge reached his conclusion was based on premises which the Judge had no right to entertain"; and "to the statements beginning with the words, 'Now, then, what probative force did this evidence have,' and ending with the words, 'It is entitled to much probative force and potency in the determination by the jury of the issues involved,' on the ground that so far as they are statements of law, they are erroneous; and so far as they are arguments of fact, they are fallacious," for reasons hereinbefore sufficiently stated, raise no question of law for the determination of this court.

We have examined carefully all the exceptions in so far as argued, and finding no error the verdicts are to stand and the entry must be

*Exceptions overruled.*